# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARXADA HOLDINGS NA INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0771-JTL |
| | ) | |
| MICHAEL HARVEY, AARON HARVEY, | ) | |
| PHIL HARVEY, CAPACITY CHEMICAL, | ) | |
| LLC, and BLUETECH LABORATORIES, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## POST-TRIAL OPINION

Date Submitted: November 3, 2025
Date Decided: January 28, 2026

Joseph L. Christensen, CHRISTENSEN LAW LLC, Wilmington, Delaware; Michael A. Duffy, Colleen E. Baime, Michael D. Lehrman, Crofton J. Kelly, BAKER & McKENZIE LLP, Chicago, Illinois; *Counsel for Plaintiff*.

Gary W. Lipkin, Devan A. McCarrie, Allison M. Neff, SAUL EWING LLP, Wilmington, Delaware; Gary B. Eidelman, SAUL EWING LLP, Baltimore, Maryland; Steven C. Kerbaugh, Kayla Kienzle, SAUL EWING LLP, Minneapolis, Minnesota; Erik P. Pramschufer, SAUL EWING LLP, New York, New York; Margaret G. Clark, SAUL EWING LLP, Wayne, Pennsylvania; *Counsel for Defendants*.

**LASTER, V.C.**

The founder, CEO, and longtime principal of a company sold it for $450 million. He agreed to work post-acquisition and comply with restrictive covenants in the stock purchase agreement.

After the buyer took over, the founder disagreed with the new direction. He advised customers on how to obtain better terms from the company. He also laid the groundwork to compete with the company.

The buyer decided to terminate the founder. After learning of his impending termination, the founder coordinated with his two nephews, who held senior roles at the company. Together, they downloaded massive amounts of information, including the company's most important trade secrets. The nephews resigned, and the founder arranged for them to receive $4 million to start a competing business. The founder advised his nephews and helped them manage the competing operation. He also bought a firm that owned intellectual property that would facilitate competition with the company's most important products, and he pursued that goal.

The buyer sued. The buyer proved that the founder, his nephews, the competitor, and the intellectual property firm misappropriated trade secrets. They are jointly and severally liable for $0.9 million in lost profits and $24,224,125.59 in disgorgement based on avoided costs. They are liable for the same amount— $25,124,125.59—in exemplary damages. The buyer can also recover its expenses (including attorneys' fees).

The buyer proved that the founder breached his restrictive covenants. He is permanently enjoined from taking action that would violate his restrictive covenants

with the injunction lasting until October 24, 2029. He cannot violate his restrictive covenants directly or indirectly. During the restricted period, he therefore cannot work for or with the competitor. He also cannot pursue projects through the intellectual property firm.

The buyer proved that the nephews, the competitor, and the intellectual property firm tortiously interfered with the founder's restrictive covenants. They are liable for $0.9 million in lost profits. That reflects the same amount of lost profits awarded for trade secret misappropriation. The buyer can only recover once.

The buyer proved that the founder and his nephews breached their fiduciary duties as employees. As a remedy, the court awards the same compensatory relief— $0.9 million in lost profits and $24,224,125.59 in disgorgement. The buyer may also recover its expenses (including attorneys' fees) as part of its damages. Here too, the buyer can only recover once. In addition, the founder and his nephews are enjoined for one year from using the confidential information they took. For the founder, the injunction awarded for breach of his restrictive covenants is already broader and longer. For the nephews, this is additional relief.

The buyer proved that the competitor and the intellectual property firm aided and abetted the breaches of fiduciary duty. Those entities are jointly and severally liable. They also face the one-year injunction.

## I. FACTUAL BACKGROUND

Trial took place over three and a half days. The parties submitted 1,043 exhibits and lodged depositions from twenty-four witnesses. Thirteen witnesses

testified live. The parties agreed on just eighty-nine stipulations of fact. The following factual findings rest on a preponderance of the evidence.[1]

## A. Mike Builds The Company.

In 1991, Michael Harvey formed Enviro Tech Chemical Services, Inc. (the "Company").[2] Based in California, the Company manufactures and sells microbial control products, including bromine-based biocides and products using peracetic acid ("PAA"), a powerful antimicrobial and disinfectant. The Company sells its products and provides related services to customers operating primarily in the agricultural, food, and beverage industries.[3]

Mike served as CEO for thirty years. He ran the Company as a family business, employing Brian Harvey, his son, and Phil and Aaron Harvey, two nephews who were like sons to Mike. Phil joined the Company in 2006 and Aaron in 2009.[4] Both rose

---

[1] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX __ at __" refer to joint trial exhibits. Citations in the form "PTO ¶ __" refer to the pre-trial order. Citations in the form "Dkt. __" refer to docket entries in this action.

[2] Mike Tr. 119. I normally identify individuals by their last names without honorifics. In this case, the members of the Harvey family share a last name. This decision uses their first names without implying familiarity or intending disrespect.

[3] *Id*. at 120.

[4] Phil Tr. 282; Aaron Tr. 409.

through the ranks to senior operational roles. Phil ultimately became Vice President of National Operations, and Aaron became Vice President of Operations.[5]

## B. The Sale

In 2021, Mike was about seventy years old and ready to retire.[6] He hired an investment banker to market the Company, and the banker prepared a confidential information memorandum to describe the Company to prospective buyers. The memorandum marketed the Company as "a category-leading producer of proprietary and high-efficacy antimicrobial and biocidal products."[7] It touted the Company's "[e]xperienced chemical research team" and represented that the Company had developed an "expansive IP portfolio" characterized by "proprietary formulations" and a "[p]ipeline of new product innovation" that includes "quaternary ammonium salts, high-performance PAA products, new methods and applications."[8]

Arxada Holdings NA Inc. (the "Buyer") is a global specialty chemicals company. The Buyer saw the confidential information memorandum and became interested.

---

[5] PTO ¶¶ 25, 50.

[6] *See* Mike Tr. 165–66 ("COVID took a lot out of me. Currently, I'm almost 75 years old, and during that period, I worked 100-hour weeks for seven months straight without a day off. And afterwards, I realized I can't do this anymore. I'm just too old. I needed to take a pause.").

[7] JX 700 at 5.

[8] *Id.* at 6, 37.

For the Buyer, the Company provided an opportunity to strengthen its microbial solutions business and enter new markets like wastewater treatment.[9]

Mike and the Buyer entered into a Stock Purchase Agreement dated December 9, 2021 (the "Sale Agreement"). Under that agreement, the Buyer acquired all of the stock in the Company for $450 million. Mike personally received $327.5 million.[10] The transaction closed in late December 2021, with the Company becoming a wholly owned subsidiary of the Buyer.[11]

Because Mike built the business and was the Company's public face, the Buyer bargained for provisions in the Sale Agreement to protect the Company's goodwill.[12] Mike signed the Sale Agreement as a party, committed to work for the Company as an employee after closing, and agreed to three restrictive covenants: (1) a non-competition covenant, (2) an employee non-solicitation covenant, and (3) a customer and supplier non-solicitation covenant. The restricted period for each covenant was

---

[9] Rinaldi Tr. 7.

[10] PTO ¶ 34.

[11] *See id.* ¶ 19; Rinaldi Tr. 11.

[12] Rinaldi Tr. 14 (testifying that for the Buyer, the restrictive covenants were "absolutely critical" because otherwise "it would have made it far too easy for Mike Harvey, who had all of the know-how, the knowledge, the resources, to compete with Arxada").

five years.[13] Phil and Aaron are not parties to the Sale Agreement and are not bound by any restrictive covenants.

## C.     Post-Closing Disagreements

After the sale, Mike, Phil, and Aaron continued as Company employees.[14] Phil and Aaron maintained their roles. Mike relinquished the role of CEO and became a senior research and development fellow reporting to the Buyer's chief technology officer.[15]

Mike's relationship with the Buyer soon grew strained. The Buyer was larger, more formal, and more procedurally driven. After taking over the Company's operations and reviewing its books and policies, the Buyer sought to impose greater structure.[16] The Company also reviewed the Company's pricing model and raised prices on a range of products to ensure profitability.[17]

Mike disagreed with those decisions, and he felt greater loyalty to the customers and his own legacy than to his new employer.[18] After the Buyer's

---

[13] JX 1 art. I [hereinafter SPA]; *id.* § 7.5.

[14] PTO ¶¶ 21, 22, 24.

[15] *Id.* ¶ 21; Rinaldi Tr. 17.

[16] *See, e.g.*, JX 122 at 2 (instructing teams not to make exceptions once the Company's policies have been made).

[17] Gallucci Tr. 628–29.

[18] *See* Mike Tr. 171 ("I was just trying to get them to realize that the customers are very important here. They are not objects."); *id.* at 180 ("Q: What did you do in reaction to hearing [customer going to competitor because of price increase]? A: I

management refused to take his suggestions, Mike began advising customers on how to get better pricing from the Company. In March 2022, for example, Mike emailed the Company's largest customer from his Company email account and told them to "play hardball with [the Buyer]" to extract pricing concessions.[19] Mike drafted emails for the customer to use in the negotiations and told them to hide his involvement.[20]

Mike also failed to adjust to his more limited post-sale role, and he became frustrated about his lack of managerial responsibility and operational control. He took the Buyer's actions personally as an affront to his legacy. In contemporaneous and subsequent communications to employees and customers, Mike called the Buyer and its employees "a-holes," "dumbasses," "a bunch of clowns," "[b]ozos," "the evil empire," "brain-dead," "a circus," and "a scumbag company."[21] He referred to David

asked them [the Buyer's management], please do not do this. You owe it to yourself and you owe it to [the Company] and me to give this your last shot.").

[19] *Id*. 179–81.

[20] JX 116 ("I've been told numerous times that 'I don't make decisions for [the Company] anymore.' Therefore, they are going to bring in a new person called Julie [Gallucci] to run the show. I've been asked to 'help her.' She is clueless and is a long-time Lonza salesperson, so she will be no help. . . . Send an email directed to me regarding your objections when you get the time. Make it clear and to the point. . . . This will help me as well, then I will pass it on to 'management.' . . . PLEASE DELETE THIS EMAIL AND DENY YOU EVER SAW IT."); *see* Mike Tr. 180–81; JX 117; *see also* JX 410.

[21] JX 116; JX 480; JX 594; JX 638; JX 664; JX 670; *see* Rinaldi Tr. 23.

Hird, a Company employee who testified credibly at trial and demonstrated deep expertise in chemical formulations and regulatory requirements, as "David Tird."[22]

Mike testified that he advised the Company's customers on how to negotiate against the Company because he wanted the Company to retain its customers. Mike, Phil, and Aaron thought the Buyer was making a mistake by raising prices. The Buyer may well have been making a mistake, but as employees, Mike, Phil, and Aaron owed the Company a duty of obedience. They had to carry out the Buyer's plan for the Company. Mike could not undermine the Buyer's strategy by helping a customer negotiate against his employer.[23]

Mike, Phil, and Aaron claimed at trial that the Buyer intentionally raised prices with the goal of driving away lower-volume, lower-margin customers.[24] Their

---

[22] JX 552.

[23] Mike also seems to have been maneuvering self-interestedly for greater influence internally. After the customer followed Mike's advice on taking a hard line against the Company, Mike used the customer's email to argue to a Buyer executive that the Buyer should follow his advice because he had "deep relationships" with customers. JX 117 at 1 ("I built this company and I still have deep relationships with many of our customers, as expressed in Rusty's email. . . . [The new CEO] had an arm's length approach and wasn't as customer concentric [sic] as myself, so he did not have the deep relationships that I do, and still do. I also know the base as well."). Mike told a different story at trial. At that point, he tried to minimize the implications of his email by claiming that after the sale, he really didn't have meaningful connections with customers. *See* Mike Tr. 170 ("My connection with the customers was—at the end, when I sold, was actually rather limited . . . . But I still maintained a relationship with probably two or three of our customers . . . .").

[24] *See* Phil Tr. 297–99; Aaron Tr. 428; Mike Tr. 178–81; *see also* Phil Tr. 295 ("Early on, some of the guys came over from Switzerland. And there was, I think, a French guy, Jerome, that came over to meet with us when Mark was there a few

testimony was not persuasive, and the contemporaneous record does not support it. The Buyer did raise prices, but not to drive off customers or exit from lower-margin products. The more credible evidence shows that under Mike's leadership, the Company cut corners and sold products that did not comply fully with regulatory requirements.[25] Under Mike's leadership, the Company also improperly accounted for costs, resulting in inaccurate depictions of product profitability.[26] The Buyer addressed those issues by correcting the Company's manufacturing and accounting

---

times. And they were very up front about the fact that they needed to—that we needed to get rid of low-producing—margin-wise, low-producing products and low-producing customers as quickly as possible to try and increase overall profit margins and to kind of reduce, like, our overall capacity.").

[25] Gallucci Tr. 667–68; Rinaldi Dep. 39 (Sep. 24, 2024); *see* Gallucci Tr. 668 ("We—basically, everybody that was on the team that I assembled to run this program to get us back into compliance was under NDA. And the customers also were not able to know this information because we were liable at this point."); *id.* ("I basically was told that this [noncompliance] was typically how they ran the business, you known, in previous. It was happening for many, many, many years."); Gallucci Dep. 27 (Sep. 23, 2024) ("We self-reported both times to the EPA."); *see also* JX 664 (Mike stating that "I've always been mortified how ridiculously strict [the Buyer] was with CSFs and disallowing minor modifications in production formulas which had disastrous consequences . . . . Is it possible for the other brain-dead people to look at it like [the Buyer]?"); *cf.* Hird Tr. 493–94 ("I think there was a pretty shocking lack of health and safety at [Phil and Aaron's business]. You know, the production guys were often not wearing any PPE. They were filling exothermic materials into totes that would then kind of start to melt, but then they'd stop it just in time.").

[26] Gallucci Tr. 628–29 ("We also, when we looked at SKU rationalization, it was whether these products were being profitable or not. When we looked at how they ran their costs, it was just raw materials. They weren't actually putting labor into—the cost of goods. So we were not making money on some of these products. So we ended up increasing prices in some areas. And some of these customers were paying, you know, only $18 for a product for a full year."); JX 149 (internal analysis of customers, pricing, volumes, and margins before and after price increase).

processes, but that resulted in logistical issues, cost increases, and new procedures, such as longer lead times so products could be manufactured in compliance with regulatory requirements.[27] The Buyer cut some unprofitable products, but did not pursue a business plan that involved abandoning low-margin customers or products.[28]

## D. The BlueTech Distribution Agreement

As Mike's dissatisfaction grew, he began to think about how he could get back into the formulation business. Mike is capable of long-range planning and thinking several steps ahead.

When mapping out his options, Mike thought of Chris Binfield, his friend of eighteen years. Binfield is the CEO of BlueTech Laboratories, Inc., and in 2016, while Mike was at the helm, the Company signed an agreement to be the exclusive

---

[27] Gallucci Tr. 640–41, 667–69; *see* JX 149 (internal analysis of customers, pricing, volumes, and margins before and after price increase).

[28] *See* Gallucci Tr. 623–26 (credibly denying on cross-examination that the Buyer had a "business plan" to "focus on higher margin customers rather than lower margin customers"); JX 130 (Gallucci writing "I am not saying every customer has to go up, we should be thoughtful. This is not an across the board increase. But we need to evaluate where we are losing money and stop this unless it is helping with absorption or contributing significantly to top line growth. Denver we are losing money at the moment on the business. We need to try in certain cases and we will lose some business. But there is also analysis that Ted has done that Bain has demonstrated we can afford to lose some business with the margin we gain."); *see also* Gallucci Tr. 634; JX 415; JX 470.

manufacturer and distributor for BlueTech's EPA registered products (the "Distribution Agreement").[29]

BlueTech's EPA registrations included two forms of PAA. Mike had built much of his career and the Company's success on manufacturing products containing PAA,[30] and those products were one of the main opportunities the Buyer saw in the Company.[31] PAA products come in two forms. Some are unregistered. Others are EPA-registered. EPA-registered products command higher margins.

Mike was familiar with BlueTech's EPA registrations, but they were incomplete and needed further work to commercialize.[32] Mike envisioned acquiring the BlueTech registrations, cleaning them up, and getting back into the PAA business after his restrictive covenants expired. At the time, Mike erroneously believed that his restrictive covenants expired on December 30, 2023, three years earlier than what the Sale Agreement prescribes.[33]

---

[29] JX 30 at 1; *see also* JX 979; PTO ¶¶ 60, 61.

[30] Mike Tr. 174 ("I was the king of PAA."); *id.* at 223 ("I'm the godfather of PAA in the United States.").

[31] *See* Rinaldi Tr. 8 ("[The Buyer] was particularly interested in [the Company]'s peracetic acid products. I'll refer to those as PAA. [The Company] offered what [the Buyer] considered was sustainable solutions, sustainable chemistries. . . . They were considered positive from an environmental perspective. And these were very, very appealing to [the Buyer] at the time.").

[32] *See* Mike Tr. 96–97; JX 140.

[33] *See, e.g.*, JX 593; *cf.* SPA art. I; *id.* § 7.5.

But there was a problem. The Distribution Agreement gave the Company a right of first refusal to purchase the EPA registrations.[34] If Mike tried to buy them, it could trigger the Company's right of first refusal.

On Friday, May 20, 2022, Mike called Binfield. They spoke for forty-four minutes.[35] Mike claimed at trial to have no memory of why he called.[36] Both Mike and Binfield denied discussing the Distribution Agreement during the call.[37] Binfield testified that all he remembered talking about during that long conversation was where to have lunch.[38]

On Saturday, May 21, 2022, Binfield drafted a letter giving the Company notice that he was cancelling the Distribution Agreement.[39] Binfield testified that "meeting with Mike—or talking to him" reminded him that the Distribution Agreement "existed," and that prompted him to take time on a Saturday to draft the

---

[34] JX 30 § 3(c); PTO ¶ 61.

[35] PTO ¶ 63.

[36] Mike Tr. 195.

[37] Binfield Tr. 701, 708; Mike Tr. 93–94.

[38] Binfield Tr. 699–700, 701.

[39] JX 134 at 1; Binfield Tr. 679.

notice.[40] He claimed he wanted to cancel the agreement as part of "cleaning up old loose ends."[41] Binfield eventually sent the letter on July 22, 2022.[42]

On Monday, May 23, 2022, Mike and Binfield had lunch.[43] Both denied discussing the Distribution Agreement.[44]

Just a few weeks later, on June 11, 2022, Mike emailed a regulatory consultant stating he was "working with" BlueTech to obtain additional approvals for BlueTech's registration.[45] Mike and Binfield signed a non-disclosure agreement two weeks later.[46] Mike never told the Company that he was working with BlueTech.[47]

### E. After Mike Learns Of His Termination, The Harveys Engage In Mass Downloading.

During summer 2022, the Buyer uncovered more serious regulatory issues with the Company's products.[48] In substance, the Company had been selling PAA

---

[40] Binfield Tr. 708.

[41] *Id.* at 676.

[42] *See* JX 1031.

[43] *See* JX 133; JX 135.

[44] Mike Tr. 93–94; Binfield Tr. 708.

[45] JX 140; Mike Tr. 96–97; Binfield Tr. 709.

[46] *See* JX 142.

[47] Mike Tr. 97–98.

[48] *See* Rinaldi Tr. 23.

products as pesticides, but had not obtained the necessary approvals.[49] Mike disagreed and became angry and combative. The Buyer decided to terminate Mike.

On August 6, 2022, Mike learned that he would be terminated.[50] Twenty minutes later, Mike told Phil.[51] On August 10, the Buyer officially terminated Mike and asked him to clean out his office the next day. Mike asked if his last day could be August 17. He claimed he needed time to set up a personal email and say his goodbyes.[52] The Buyer accommodated his request. Mike refused to sign a separation agreement providing for severance and containing confidentiality provisions.[53]

Phil and Aaron submitted resignation letters effective September 15, 2022. The Company offered them separation agreements providing for severance and containing confidentiality provisions. They declined to sign.[54]

Before he left, Mike contacted Jon Anderson, the Company's Director of Information Technology. At Mike's request, Anderson set up an email forwarding function in the Microsoft Exchange administration portal so that emails to Mike's

---

[49] *See id.* at 23–24.

[50] JX 949 at 2.

[51] JX 1020 at 2; Phil Tr. 278.

[52] *See* Mike Tr. 184. Mike already had a personal email. *See* JX 142 at 1.

[53] *See* JX 430.

[54] *See* JX 639 at 3; Rinaldi Tr. 52; Aaron Dep. 17 (Sep. 21, 2024).

Company address would go to his personal email address.[55] Despite the unusual request, Anderson told no one.[56] Anderson also ensured that any forwarded email would be deleted from Mike's Company email outbox so it would not be noticeable.[57] Using the setup, Mike viewed and responded to emails from Company employees and customers after his termination, without the Buyer's knowledge.[58] Mike exploited the information to try to divert business from the Company and to monitor the Company's awareness of the post-departure activities that he, Phil, and Aaron were pursuing.[59]

---

[55] *See* Mattfeld Tr. 726; Anderson Dep. 15, 17, 22; JX 904 at 4; JX 702 at 2; JX 724; *see also* JX 398; JX 399; JX 400; JX 401; JX 402.

[56] Anderson Dep. 22.

[57] *See* JX 702 at 26.

[58] *See id.* at 24–25, 27; *see, e.g.*, JX 433.

[59] *See, e.g.*, JX 431 ("I talked to David Iasic tonight. He is a [Company] customer and will switch all his business when you are ready. It's about $600–$800k. Also Madison will sign up . . . maybe $1m with no warehousing."); JX 433 at 1 ("I am not under any NDA or restrictions. I didn't sign one on my exit. However, my 2 boys quit [the Buyer] and are starting their own company in a few months and I know they'd be quite interested in being a distributor in CA if that works. They also are under no restrictions as well, so this could be a good fit."); JX 404 (internal email attaching supplier price update); JX 1102 (same); *see also* JX 702 at 26–27.

Mike testified that he could not recall asking Anderson to set up the forwarding function and did not pay attention to the details. Mike Tr. 188–89. Mike's extensive involvement with the forwarded emails renders that testimony not credible. He may not have understood the exact operation of the Microsoft Exchange portal, but he knew what Anderson did.

15

Mike, Phil, and Aaron used their last days of employment to download information in a bout of "mass copying activity."[60] Each focused on specific types of information, suggesting they coordinated their efforts. In the aggregate, they took everything anyone needed to build and run a competing chemical company.

Mike mainly took information about the Company's formulas and regulatory compliance. A forensic report shows that he copied approximately 1,700 electronic documents to a flash drive on his last day.[61] He took boxes of documents, including regulatory documents such as efficacy studies and toxicity results.[62] He also took 1,051 Company formula sheets.[63]

Aaron mainly took documents relating to Company operations.[64] A forensic report shows that after learning of Mike's imminent termination on August 6, Aaron

---

[60] Mattfeld Tr. 743–44.

[61] *Id.* at 730–32; JX 904 at 3. In his testimony, Mike denied using a "thumb drive to access or store information on the last day of [his] employment." Mike Tr. 188. But the forensic evidence demonstrates that on his last day, someone transferred over 1,700 documents from Mike's laptop to an external drive. Mattfeld Tr. 731; *see also* JX 817.

[62] Donabed Tr. 579; *see id.* at 581 ("So it was brought up initially from the regulatory agent at the time that some of the documents were missing. . . . And she said the files, you know, had been cleaned out and she didn't have them. And this has, you know, continuously cascaded on now with the current regulatory team to try to locate some of these documents that have been missing.").

[63] Mike later sent the formula sheets to Phil and Aaron. *See* JX 557; JX 558; JX 559; JX 560; JX 561; *see also* JXs 925–36.

[64] JX 904 at 3; *see also* JX 812 (user generated files reports); JX 817 (same); JX 1017 (same).

16

began downloading these files to a flash drive. During August, he downloaded more than 16,000 Company documents into a folder he misleadingly titled "safety review."[65] The documents included the Company's sales data for 2021 (the prior year) and the first half of 2022,[66] year-to-date sales forecasts for PAA,[67] supplier data,[68] label files,[69] quality control data sheets,[70] and pictures of Company equipment and facilities.[71] He also took a small collection of 220 Company formulas.[72] The documents amounted to a snapshot of the Company's entire operation.[73]

---

[65] Aaron Tr. 433–34, 443–45; Mattfeld Tr. 740–41; JX 814 (laptop imaging reports); PTO ¶ 57; JX 904 ¶¶ 32(e) and (k); JX 963 (index of the "safety review" folder).

[66] JX 146; JX 147; JX 151.

[67] JX 145; Donabed Tr. 593–95.

[68] JX 381; JX 382; JX 383; JX 387; JX 388; JX 389; JX 390; JX 391; JX 392.

[69] Donabed Tr. 597.

[70] *Id.* at 600–10.

[71] *Id.* at 596; *see, e.g.*, Dkt. 331 Ex. G at 35.

[72] PTO ¶ 57; *see, e.g.*, JXs 156–353 (formula sheets); JXs 355–79 (formula sheets). Eighty-nine formulas are unique and not duplicative of the formulas Mike took. *See* JX 906 at 4.

[73] *See* JX 906 at 11–15.

Phil downloaded information on key Company customers.[74] A forensic report shows that he downloaded 7,501 documents to a flash drive.[75] During discovery, Phil denied keeping the information,[76] but other evidence suggests he gave it to Aaron.[77]

During discovery, Mike, Phil, and Aaron did not produce either the flash drives or their contents.[78]

## F.     Phil And Aaron Start Capacity Chemical.

Shortly before leaving the Company, Phil and Aaron took steps to form Capacity Chemical, LLC.[79] Mike supported them, collaborated with them, and gave

---

[74] Mattfeld Tr. 734–35; JX 904 ¶ 43; *see* JX 441.

[75] Mattfeld Tr. 729–31; JX 904 ¶ 43.

[76] JX 766 at 10–11; JX 919.

[77] *Compare* JX 821, row 12, column C *with* JX 962, "Connected Devices" sheet, row 4, column A; *see also* JX 441 (Phil's email attaching customer information to his own employee); *see* Phil Tr. 281–82.

[78] Mattfeld Tr. 730–33; JX 904 at 13, 16, 25.

[79] A law firm invoice indicates that three days before their last day at the Company, Phil and Aaron began pre-engagement conversations with the firm about starting Capacity Chemical. JX 455 at 3.

them advice.[80] He also enabled them to fund the startup and initial operations of Capacity Chemical with $4 million from trusts he had established on their behalf.[81]

In the near term, Phil, Aaron, and Mike planned for Capacity Chemical to operate as a down-market competitor of the Company that would focus on dissatisfied customers and products the Company had cut back on.[82] Over the longer term, they planned to compete with the Company in the PAA market using BlueTech's EPA registrations.[83]

---

[80] During the six weeks between Mike's termination notice and Phil and Aaron's last day, Mike, Phil, and Aaron had 177 phone calls lasting over twenty-seven hours. *See* JX 825 at 3–12; JX 826 at 53–55; JX 860 at 265–85. A law firm invoice indicates that Mike also talked with their lawyers. JX 455 at 3.

[81] JX 424 at 3 ("Tomorrow (Wed) [September 15, 2022] I'd like to fund Aaron and Phil's Trust at $2Mil each."); *see* Phil Tr. 247–48; PTO ¶45. Phil and Aaron invested "[e]very dime of that $4 million" into Capacity Chemical. Phil Tr. 248.

[82] *See* Hird Tr. 476 (testifying that Phil and Aaron "were going to focus heavily on agricultural product, on products they felt were not big movers for Arxada, and that they wanted to capture some of the customer base that Arxada maybe didn't care enough about; weren't, you know, profitable enough to Arxada to be of concern to them.").

[83] *See* JX 1019 (Mike texting potential business partner on August 10, 2022, "Phil suggested doing a new LLC for the PAA . . . . There can't be any blow-back that way."); JX 419 (Mike emailing potential business partner on September 9, 2022, "Hey pal. Just a head's up that Phil will be contacting you next week to discuss sharing the PAA registrations costs that are being considered. He and Aaron resigned from [the Buyer] and next Thursday is their last day."); *see also* JX 615 (Phil emailing the accountant for Capacity Chemical saying, "Due to Mike's contractual restrictions we've been advised to steer clear of having the trusts invest in the business directly. . . . Will an LLC still be the most advantageous entity? Our long term plans are to grow the business as much as possible for the first 3 years then target either a sale or a major expansion at that time.").

Phill and Aaron testified that they were equal owners of Capacity Chemical and that Mike had no role. That testimony was not persuasive. Phil and Aaron viewed Mike as financing the business.[84] He also had the industry relationships and technical expertise they needed. Phil and Aaron are neither scientists nor chemists,[85]

---

[84] *See* Hird Tr. 484 (employee testifying that while he was working at Capacity Chemical, Phil and Aaron told him to do what Mike wanted, saying, "Mike's financing the business, and therefore, we kind of have to do what he says").

Mike claims that he did not fund Capacity Chemical. Instead, he gifted "$2 million each" to his son Bryan, his nephews Phil and Aaron, and his stepson Steve Hoffman as part of intergenerational wealth planning. Mike points out that Bryan used his money to start a gold simulator shop and Steve to start a charter airplane business. *See* Mike Tr. 166–67. True, but none of the recipients controlled their trusts, Mike appointed his wife as the trustee of their trusts for the first five years, and Phil and Aaron would only obtain control as successor trustees after the five-year period. JX 101 art. I, pmbl.; *id.* § 3.02(a); JX 103 art. I, pmbl.; *id.* § 3.02(a). Furthermore, although Phil's and Aaron's trust agreements were executed in 2021, *see* JX 101; JX 103, Mike funded their "$2 million each" after he, Phil, and Aaron started planning for Capacity Chemical. *Compare* JX 424 *with* Mike Tr. 167. Not only that, but Mike enabled Phil and Aaron to access the funds—which were still under Mike and his wife's control—by loaning them money from their trusts at 2% simple interest with a balloon payment due after five years. *See* JX 432. That structure was also intended to reduce the risk that the funding would ensnarl Capacity Chemical in Mike's restrictive covenants. *See* JX 615 (Phil emailing Capacity Chemical accountant saying, "Due to Mike's contractual restrictions we've been advised to steer clear of having the trusts invest in the business directly."); JX 445 (invoice showing that Phil and Aaron's corporate attorney advising on the founding of Capacity Chemical had talked to Mike). Without Mike's backing, Phil and Aaron could not have financed Capacity Chemical. *See* Mike Tr. 166–67; JX 112. In fact, when Capacity Chemical experienced a cash crunch, Mike gave Phil and Aaron a $200,000 loan. JX 720. But for his restrictive covenants, Mike might have funded the business directly.

[85] *See* Mike Tr. 66; *see also* Hird Tr. 472–74 (testimony from the Company's long-time chemist); Donabed Tr. 566 (same).

20

they "know almost nothing about Regulatory [work],"[86] and they had never started a chemical business.[87] They could not run Capacity Chemical or commercialize PAA products without Mike's help.[88]

Functionally, Mike was the senior partner, and Phil and Aaron generally did what he wanted. At one point, he told Phil and Aaron that the "deal is off" if they did not follow his instructions.[89] In return for his support, Mike expected their loyalty and the freedom to run Capacity Chemical's formulation lab and manage its technicians.[90] He also directed the PAA commercialization effort.[91]

---

[86] *See* JX 640; Mike Tr. 68.

[87] *See* Mike Tr. 67.

[88] *See* JX 571; *see also* Mike Tr. 235 ("And I just wanted to be certain that Phil and Aaron, if they're going to sell PAA to [a customer], had to have their stuff together and couldn't afford to have this product swell up in drums and explode in the back of a truck on the way to Mexico.").

[89] JX 589 ("Unless you can guarantee that you won't use recycle anything for your PAA then my deal is off with Capacity. When will you learn? At [the Company] we went through this many times.").

[90] *See* JX 551 at 4 (Mike's involvement in lab technician hiring); JX 953 at 2 (same); JX 640 (same); JX 545 (hiring). Mike denied that he ran the lab. *See* Mike Tr. 91, 216. He also insisted that he technically was not an employee. *See* JX 538. Regardless, he directed the lab work. *See* Hird Tr. 496; Aaron Dep. 32–33 (Sep. 21, 2024). Mike also helped develop formulas for Capacity Chemical. *See* Hird Tr. 485. Capacity Chemical's only chemist "was told to . . . allocate [his] time to focus on working for Mike on those products and projects." Hird Tr. 484. After Hird rejoined the Company, Mike told several Capacity Chemical lab technicians that he "will be [their] supervisor going forward." JX 550.

[91] *See* Hird Tr. 489 (testifying to Mike's senior advisor status); *id.* at 490 ("[On doing work for PAA product or formula at Capacity Chemical] You know, it ebbed and

### G. Mike Buys BlueTech And Its EPA Registrations For PAA Products.

In November 2022, Mike agreed to buy BlueTech from Binfield for $150,000.[92] The deal closed in early 2023. As the owner of BlueTech, Mike could clean up its EPA registrations and make them available to Phil and Aaron to sell PAA through Capacity Chemical. The "king of PAA"[93] would be back.

But buying BlueTech increased the risk that the Buyer would put together the pieces of Mike's plan, so Mike concealed the purchase.[94] He listed Brooke Lee, his stepson's then-girlfriend, as the managing member because her name was not

---

flowed . . . . [T]here could be weeks where [PAA work] was my primary thing that I did that work. So it would ebb and flow, but up to 50 percent on some busy weeks, maybe 20 percent, 25 percent on some quieter weeks.").

[92] *See* JX 443; Binfield Tr. 712. Mike gave Binfield an interest in Skylight Capital, LLC, the entity he used for the purchase, so that Binfield could "be involved and partake in some rewards for this endeavor." JX 569 at 1. Mike separately loaned $175,000 to Binfield to help him through a financial difficulty. *See* JX 497; Binfield Tr. 714. Since the deal closed, Binfield has asked Mike for additional loans. At trial, Binfield testified that he already asked Mike for more money, but Mike said that "he couldn't because of this case." Binfield Tr. 719–20.

[93] Mike Tr. 174; *see id.* at 223 ("I'm the godfather of PAA in the United States.").

[94] *See* Mike Tr. 206; Mike Dep. 24 (Sep. 18, 2024).

Harvey.[95] He told Binfield and Lee that he needed to remain anonymous until the end of 2023, when he mistakenly thought his restrictive covenants expired.[96]

Mike encouraged everyone on the BlueTech deal and PAA registrations to keep them "on the down low."[97] Mike also asked Phil and Aaron to lie about who purchased BlueTech and say Capacity Chemical bought it. Aaron responded, "Absolutely."[98]

## H.     Mike's Post-Departure Communications

After leaving the Company, Mike sent taunting emails to the Buyer. On November 6, 2022, he informed the Buyer that he was "advising most of [the Company's] largest customers how and when to cease business with [the

---

[95] JX 443 ("I 100% confirmed today that I am buying . . . BlueTech, a Delaware Corporation . . . to be the parent company for the PAA and other registrations" and that "[BlueTech] will be owned by a[n] LLC that has my stepson listed as the manager. He does not have a last name of Harvey. There is no way [the Buyer] or anyone else for that matter can figure this out. It insulates all of us. I am now good to go on my end. Let's do this."); *see* JX 494; Mike Dep. 57–58 (Sep. 18, 2024); JX *see also* JX 532 (showing Lee nominally signing company document for Mike).

[96] *See* JX 569 (claiming that he only needed to remain anonymous due to his covenants until December 2023); JX 593 ("I am no longer bound to comply after Dec[.] 30, 2023."); Mike Tr. 99–100 (same).

[97] JX 498 ("I'm working on the PAA part of [Capacity Chemical] but that needs to be on the down low."); *see* JX 601 at 2 ("Keep in mind no one knows what I'm doing except my boys, and now you."); JX 443 ("There is no way [the Buyer] or anyone else for that matter can figure this out."); JX 611 ("It is important not to tell Todd anything we are doing at BlueTech. He . . . would . . . throw me under the [Buyer] bus for violating my non-compete.").

[98] JX 614; Mike Tr. 107–08; *see* JX 629 at 2 (Mike texting the Company's former sales director, "We need to spread the message that it is Capacity that bought Chris Binfields [sic] BlueTech Labs labels.").

23

Company]."[99] He also denied funding Capacity Chemical and said he had no control over how Phil and Aaron choose to use their money.[100] Phil had told the Buyer that Capacity Chemical was a chemical logistics service company and that Mike was not involved.[101] Mike's preemptive denial seemed suspicious.

Two months later, Mike again told the Buyer that Company customers were moving their orders. He wrote that two Company customers "will pull ALL business soon and perhaps will never do business with [the Company] again."[102] He said more reductions were coming.[103]

## I.    Mike Sends Phil And Aaron The Master Formula Database.

In August 2023, to speed up the PAA registration work and help sell other competing products, Mike sent Phil and Aaron a "master formula database" consisting of more than 1,000 Company formulas with instructions on how to use

---

[99] JX 446 at 2.

[100] *Id.* ("The boy's [sic] Trust funds were set up months BEFORE the transaction close and I am not the Trustee. How or when the boy's choose [sic] to use their trusts is up to them and I have no influence or control.").

[101] *See* JX 639 (internal employee email reporting to management that "I talked to Phil yesterday about his plans and he states that he is looking into providing logistics services initially like transloading operations and then look at potential chemistries they can pick up themselves at some point."); JX 442 ("In light of recent developments—that is, Phil and Aaron Harvey starting a business that potentially competes with [the Buyer] . . . .").

[102] JX 597 at 10.

[103] *Id.*

them.[104] Phil stated, with Aaron copied: "This stuff is fantastic Mike. We've developed a formula database . . . and this material will be a perfect fit for it."[105]

Mike did not send generic chemical formulas one might find in a textbook. He sent a repository of the information necessary to manufacture and commercialize the Company's products on an industrial scale. The Buyer's expert opined persuasively that "[t]hese formulations represent years of accumulated technical knowledge, testing, customer feedback, research, and trial and error."[106]

Capacity Chemical used the formulas extensively.[107] Capacity Chemical viewed its mission as matching the Company's product portfolio while beating the Company on price.[108] The formulas were the key to doing that.

---

[104] *See* JX 557; JX 561; JX 559; JX 560; JX 558.

[105] JX 564.

[106] JX 906 at 12. The formulas contained "raw materials for each formula, the percentage (to the second decimal point) of each raw material or component, the cost of each raw material, and the total cost of each formula. The master formula sheets also include comment boxes that contain sensitive business intelligence, including, in some instances, specific instructions for manufacturing the products. Accompanying all of these detailed information are also underlying analytical methods, safety labeling, and packaging." *Id.* at 5.

[107] Aaron forwarded these formulas to Capacity Chemical's chemist. *See* JX 575; JX 576; JX 577; JX 578.

[108] JX 641; *see also* JX 530 ("Our shop is built to be nimble and pragmatic, similar to the old Enviro Tech [the Company], but with a few modern upgrades.").

**J.    Mike, Phil, And Aaron Plan To Compete On PAA Using BlueTech's Registrations.**

In April 2024, Mike obtained Organic Materials Review Institute ("OMRI") certification for a BlueTech PAA product.[109] Mike immediately forwarded the certification to Phil and Aaron, writing: "Guys: Oxy 5 is approved for crop management and production aids. Here we go! . . . I would think we can commercialize this in a couple weeks."[110] Mike then emailed Binfield the next day, telling him: "This product can be available from Westley as early as next week. . . . The boys (Phil and Aaron) will be selling it sooner than later."[111] Westfield is where Capacity Chemical is located.

Soon after receiving the OMRI certification, Aaron emailed nearly a dozen Company customers telling them about Capacity Chemical's "5.6% PAA called Oxy 5."[112] Capacity Chemical planned to enter the PAA market and beat the Company on price there as well.[113]

---

[109] JX 619.

[110] *Id.*

[111] JX 620.

[112] *See* JX 621 ("Here is our first Omri [sic] certified irrigation line treatment, its [sic] for the 5.6% PAA called OXY 5."); *see also* JX 622; JX 624; JX 625; JX 630; JX 648; JX 649; Aaron Tr. 423–25.

[113] *See* JX 628 at 3 (Buyer's internal email reporting to management that, "My customer (the operations manager) brought [Capacity Chemical's PAA pitch] to my attention because he wants to continue to do business with us/me, but if we aren't flexible on price the owner of the company is going to mandate, they order through Capacity."); *see also* Phil Tr. 403–04.

**K.      This Litigation And The Spoliation of Evidence**

The Buyer filed suit on July 22, 2024. The Buyer asserted a claim for misappropriating trade secrets against all defendants. The Buyer asserted claims for breach of contract against Mike and for tortious interference with contract against Phil, Aaron, Capacity Chemical, and BlueTech. The Buyer asserted claims for breach of fiduciary duty against Mike, Phil, and Aaron and for aiding and abetting breaches of fiduciary duty against Capacity Chemical and BlueTech. The Buyer sought injunctive relief, damages, and expenses (including attorneys' fees).

During discovery, Mike, Phil, and Aaron spoliated evidence. They did not produce any of the flash drives that they used to download over 25,000 Company documents.[114] Mike and Phil claimed not to remember downloading Company documents to flash drives.[115]

Before the litigation and during discovery, Mike deleted evidence and attempted to intimidate a Company witness. Mike testified that, at some time after the commencement of this litigation, he changed the settings on his phone to delete all messages older than thirty days.[116] As a result, any earlier messages are "completely gone."[117]

---

[114] Mattfeld Tr. 732–33, 737; Aaron Tr. 434–35.

[115] Mike Tr. 188; Phil Tr. 280.

[116] Mike Tr. 113–14; Mike Dep. 22 (Apr. 18, 2025).

[117] Mattfeld Tr. 725; JX 904 at 20.

## II. PERSONAL JURISDICTION

Phil, Aaron, and Capacity Chemical are California residents, and they challenge the court's ability to exercise personal jurisdiction over them. The Buyer proved that personal jurisdiction exists.

Deciding personal jurisdiction after trial is counter intuitive. After all, by the time a defendant defeats jurisdiction at trial, the defendant will have spent the whole case litigating in a court that lacks jurisdiction. Technically, however, the question of personal jurisdiction often remains open until trial. Even when a court denies a pleading-stage Rule 12(b)(2) motion, if the court has not held an evidentiary hearing and made jurisdiction-related factual findings, "then the jurisdictional question technically remains open until trial, when the plaintiff must prove the jurisdictional facts by a preponderance of the evidence."[118]

Holding an early evidentiary hearing might seem like the solution, and it makes sense when personal jurisdiction turns on factual issues distinct from the merits. When, as here, the basis for personal jurisdiction intertwines with the merits,

---

[118] *Harris v. Harris*, 289 A.3d 277, 296 (Del. Ch. 2023); *see Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 831 (5th Cir. 1986) ("However, 'at any time when the plaintiff avoids a preliminary motion to dismiss by making a prima facie showing of jurisdictional facts, he must still prove the jurisdictional facts at trial by a preponderance of the evidence,' or, as otherwise stated, '[e]ventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at a trial.'" (first quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.2 (9th Cir. 1977); then quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981))), *modified in rehearing in unrelated part*, 836 F.2d 850 (5th Cir. 1988).

holding an early evidentiary hearing can generate more problems than it solves. I learned that lesson in *Perry v. Neupert*.[119] The plaintiff alleged that a Liechtenstein foundation engaged in a tortious conspiracy with effects in Delaware. The plaintiff established a pleading-stage basis for conspiracy theory jurisdiction.[120] The foundation disputed the jurisdictional showing, so I proposed to hold an evidentiary hearing. The parties were both interested in an early adjudication and expressed confidence that any factual findings from the jurisdictional phase would have significance for the rest of the case.[121]

The parties litigated vigorously during the jurisdictional phase. They filed six motions to compel, plus a motion in limine.[122] They agreed to thirty stipulations of undisputed fact and on the use of two witness affidavits in lieu of live testimony.[123] During a two-day evidentiary hearing, the parties introduced 234 exhibits, and two

---

[119] *Perry v. Neupert*, 2019 WL 719000 (Del. Ch. Feb. 15, 2019).

[120] *See In re Côte d'Azur Est. Corp.*, 2022 WL 4392938, at *6 (Del. Ch. Sep. 19, 2022) (describing earlier stages of case).

[121] *See Perry v. Neupert*, C.A. No. 2017-0290-JTL, at 15–20 (Del. Ch. June 22, 2021) (TRANSCRIPT).

[122] *See id.* at 16.

[123] *Perry*, 2019 WL 719000, at *3.

witnesses testified live.[124] I made findings of fact based on a preponderance of the evidence and found the foundation was subject to the court's jurisdiction.[125]

It turned out that when the parties agreed that factual findings from the jurisdictional phase would have significance for the merits, it meant they would rely on the findings they liked and fight tooth and nail against the rest. Scant law addresses whether factual findings from an early evidentiary hearing bind the parties at later stages of the case, whether those findings can support a motion for summary judgment, or whether the parties and the court can revisit them.[126] Questions swirled around their effect on other parties who were not involved in the dispute over personal jurisdiction.[127] Merits discovery expanded as the parties sought other evidence that had not been presented during the jurisdictional hearing.[128] Those

---

[124] *Id.*

[125] *Id.* at *4, *37.

[126] *See Perry v. Neupert*, C.A. No. 2017-0290-JTL, at 15–20 (Del. Ch. June 22, 2021) (TRANSCRIPT) (denying plaintiff's motion for summary judgment that relied on findings of fact made during jurisdictional phase).

[127] *See Côte d'Azur*, 2022 WL 4392938, at *7 ("The question is what to do with this voluminous record for purposes of evaluating the motion to dismiss.").

[128] *See Perry v. Neupert*, 2021 WL 2580656, at *1 (Del. Ch. June 22, 2021) ("The defendants have shown that certain topics of discovery potentially could affect the rulings that the court made during the personal jurisdiction phase. Accordingly, the court will permit discovery on the merits to proceed.").

broader discovery efforts generated disputes.[129] The experience suggested that when jurisdictional issues intertwine with the merits, an early evidentiary hearing is not helpful.

Here, Phil, Aaron, and Capacity Chemical moved to dismiss under Rule 12(b)(2). Ruling on the papers and construing the evidence in favor of the plaintiff, I found grounds for exercising personal jurisdiction. Informed by *Perry v. Neupert*, I declined to hold an evidentiary hearing on personal jurisdiction and deferred the issues until trial.[130] In making that case management decision, I considered that Phil, Aaron, and Capacity Chemical would participate in discovery in any event, that Phil and Aaron had family relationships with Mike, and that Phil and Aaron likely would appear as trial witnesses regardless.

After trial, Phil, Aaron, and Capacity Chemical renewed their personal jurisdiction challenge. With the benefit of a factual record, this decision denies that motion.

---

[129] *See In re Cote d'Azur Est. Corp.*, 2023 WL 1866826 (Del. Ch. Feb. 8, 2023) (denying motion for protective order and granting discovery relating to statements that conflicted with positions taken during evidentiary hearing on personal jurisdiction); *In re Côte d'Azur Est. Corp.*, 2022 WL 17574747 (Del. Ch. Dec. 12, 2022) (addressing letters of request for discovery from four Israeli attorneys); *In re Côte d'Azur Est. Corp.*, 286 A.3d 504 (Del. Ch. 2022) (addressing letter of request to obtain materials Swiss prosecutors seized when investigating a Swiss attorney); *Perry v. Neupert*, 2022 WL 2189163, at *1 (Del. Ch. June 16, 2022) (granting motion to enforce subpoena to accountant).

[130] Dkt. 97 at 91; Dkt. 98 at 20

## A. The Standard For Evaluating Personal Jurisdiction

Evaluating personal jurisdiction involves a two-step inquiry. First, the court must determine whether a statute supplies a basis for serving and asserting jurisdiction over the nonresident defendant. If so, then the court must determine whether the assertion of personal jurisdiction complies the Due Process Clause of the United States Constitution.[131]

The Buyer relies on the Delaware Long-Arm Statute. The pertinent section states:

> As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the State . . . .[132]

"[A] single transaction is sufficient to confer jurisdiction where the claim is based on that transaction."[133] The forum-directed activity can be accomplished "through an agent."[134]

---

[131] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012). *See generally* 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.02, LexisNexis (database updated Dec. 2025).

[132] 10 *Del. C.* § 3104(c)(1).

[133] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000) (internal quotation marks omitted); *accord LaNuova D & B S.p.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986).

[134] 10 *Del. C.* § 3104(c).

For the assertion of personal jurisdiction to comply with due process, the nonresident defendant must have sufficient contacts with the jurisdiction.[135] The contacts must be sufficient such that "compelling [the defendant] to defend [itself] in the State would be consistent with the traditional notions of fair play and substantial justice."[136]

To meet both the statutory and constitutional requirements, the Buyer relies on the conspiracy theory of jurisdiction.[137] Under that theory,

> a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[138]

The theory rests "on the legal principle that one conspirator's acts are attributable to the other conspirators."[139] Thus, "if the purposeful act or acts of one conspirator are

---

[135] *Moore v. Little Giant Indus., Inc.*, 513 F. Supp. 1043, 1048 (D. Del. 1981), *aff'd*, 681 F.2d 807 (3d Cir. 1982) (TABLE).

[136] *Waters v. Deutz Corp.*, 479 A.2d 273, 276 (Del. 1984) (internal quotation marks omitted).

[137] *See Fläkt Woods*, 56 A.3d at 1027.

[138] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982).

[139] *Fläkt Woods*, 56 A.3d at 1027.

of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court."[140]

By satisfying the requirements for the conspiracy theory of jurisdiction, a plaintiff satisfies the two-prong jurisdictional test. The first two *Istituto Bancario* elements address the statutory prong of the test. The fourth and fifth *Istituto Bancario* elements address the constitutional prong of the test. The third *Istituto Bancario* element has implications for both.

The first three *Istituto Bancario* elements encompass the statutory prong of the test by addressing the requirements of the Delaware Long-Arm Statute. Meeting the third *Istituto Bancario* element—showing that a "substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state"—satisfies the statutory requirement that the defendant have transacted business or performed work in Delaware. Meeting the first and second *Istituto Bancario* elements—the existence of a conspiracy and the defendant's membership in it—provides grounds for imputing the jurisdiction-conferring act to the defendant under agency principles.[141] The conspiracy theory itself is not an independent basis for jurisdiction, but meeting

---

[140] *Istituto Bancario*, 449 A.2d at 222.

[141] *Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*, 611 A.2d 476, 481 (Del. 1992) ("[C]onspirators are considered agents for jurisdictional purposes."); *accord Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *12 (Del. Ch. Nov. 21, 1995) (Allen, C.).

34

the first, second, and third *Istituto Bancario* elements satisfies the Long-Arm Statute's requirements.

The third, fourth, and fifth *Istituto Bancario* elements encompass the constitutional dimension. The third element requires more than just any act or effect associated with the conspiracy; it demands "a substantial act or substantial effect in furtherance of the conspiracy."[142] That requirement speaks to the sufficiency of the forum-directed contacts. The fourth and fifth elements—whether the defendant "knew or had reason to know of" the forum-directed activity and the degree to which the forum-directed activity was "a direct and foreseeable result of the conduct in furtherance of the conspiracy"—address whether the defendant could reasonably anticipate being sued in the jurisdiction.[143] "[A] defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws."[144]

As a gloss on these principles, the defendants argue that the conspiracy theory of jurisdiction must be narrowly construed. True, *Istituto Bancario* called for "a strict

---

[142] *Istituto Bancario*, 449 A.2d at 225.

[143] *See Carlton Invs.*, 1995 WL 694397, at *12.

[144] *Istituto Bancario*, 449 A.2d at 225; *accord Hercules*, 611 A.2d at 482 n.6 (explaining that the conspiracy theory "provides a framework with which to analyze a foreign defendant's contacts with Delaware").

test,"[145] and this court asserted in 2000 that the test must be "very narrowly construed" to ensure that a plaintiff did not "circumvent the minimum contacts requirement."[146] That was before the Delaware Supreme Court applied the test in 2012 without call for a strict or narrow—much less very narrow—construction.[147] That was also before Delaware decisions viewed the conspiracy theory as a rubric for (1) analyzing whether action through an agent complied with the Long-Arm Statute and (2) evaluating minimum contacts.[148]

---

[145] *Istituto Bancario*, 449 A.2d at 225 ("To our knowledge, the United States Supreme Court, as yet, has not definitively examined the conspiracy theory of jurisdiction. We must therefore attempt to formulate a workable standard, recognizing that evolution will inevitably call for refinement. . . . We believe a strict test, modeled after the ones used in cases which have previously recognized the conspiracy theory of jurisdiction, withstands due process scrutiny [under *International Shoe*].").

[146] *Crescent*, 846 A.2d at 976 (admonishing that conspiracy jurisdiction should be "very narrowly construed"). A series of Court of Chancery cases have echoed that assertion. *See Lone Pine Res., LP v. Dickey*, 2021 WL 2311954, at *10 (Del. Ch. June 7, 2021); *Morrison v. Berry*, 2020 WL 2843514, at *13 (Del. Ch. June 1, 2020); *Stimwave Techs. Inc. v. Perryman*, 2020 WL 6735700, at *5 (Del. Ch. Nov. 17, 2020); *Morrison v. Berry*, 2020 WL 2843514, at *13 (Del. Ch. June 1, 2020); *see also Werner v. Miller Tech. Mgmt., LP* 831 A.2d 318, 329-30 (Del. Ch. 2003) ("Importantly, this test is a strict test that should be construed narrowly.").

[147] *See Fläkt Woods*, 56 A.3d at 1027-30.

[148] *See BV Advisory Partners, LLC v. Quantum Computing Inc.,* 2024 WL 2723119, at *8 (Del. Ch. May 28, 2024); *In re Swervepay Acquisition, LLC,* 2022 WL 3701723, at *14 (Del. Ch. Aug. 26, 2022); *In re Tilray, Inc. Reorganization Litig.,* 2021 WL 2199123, at *19 (Del. Ch. June 1, 2021); *Lacey v. Mota-Velasco*, 2020 WL 5902590, at *6 (Del. Ch. Oct. 6, 2020); *Morrison*, 2020 WL 2843514, at *13; *Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *9 (Del. Ch. Feb. 24, 2020); *iBio, Inc. v. Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V.,* 2018 WL 6493503, at *3 (Del. Ch. Dec. 10, 2018)*; Konstantino v. AngioScore, Inc.,*

That understanding obviates the rhetorical gloss. While defendants resisting personal jurisdiction doubtless will continue to collect citations calling for a narrow interpretation, a court can skip the rhetoric and focus on whether the plaintiff has satisfied all five elements of the *Istituto Bancario* test.[149]

## B.   The Existence Of A Conspiracy

The first and second *Istituto Bancario* elements require a plaintiff to show "a conspiracy . . . existed" and "the defendant was a member of that conspiracy."[150] The Buyer proved that Mike, Phil, and Aaron conspired to misappropriate the Company's trade secrets and breach their fiduciary duties. In doing so, they also conspired with the entities they controlled: Capacity Chemical and BlueTech.

Mike, Phil, and Aaron engaged in a conspiracy. After learning that Mike would be terminated, they coordinated their departures and their downloading of

---

2015 WL 5770582, at *6 (Del. Ch. Oct. 2, 2015); *Virtus Cap. L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *12 (Del. Ch. Feb. 11, 2015).

[149] Alternatively, a court could balance competing rhetorical glosses. For example, the long-arm statute is to be "broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause." *Hercules*, 611 A.2d at 480; *accord LaNuova D & B, S.p.A v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986). "[T]rial courts must give a broad reading to the terms of the long-arm statute[ ] in order to effectuate the statute's intent to ensure that this state's court may exercise jurisdiction to the full limits permissible under the Due Process Clause … and rely upon a Due Process analysis to screen out uses of the statute that sweep too broadly." *Sample v. Morgan*, 935 A.2d 1046, 1056 (Del. Ch. 2007). Those exhortations logically apply to the elements of the test for conspiracy jurisdiction that track the statutory requirements.

[150] *Istituto Bancario*, 449 A.2d at 225.

documents. They worked together to set up Capacity Chemical, with Phil and Aaron doing the legwork and Mike providing access to the funding and lending his expertise. The near-term goal of the conspiracy was to use the Company's formulas and confidential information to compete with the Company, target its customers, and undercut its prices. The longer-term plan was to use BlueTech's EPA registrations to sell PAA products to the Company's customers.

The BlueTech-related acts were core to the conspiracy and the long-term goal of competing directly with the Company in the PAA market. Mike contacted BlueTech and began working on the EPA registrations and a potential acquisition months before he was terminated by the Company. Soon after his termination, he acquired BlueTech.

## C.    Substantial Forum-Directed Acts

The third *Istituto Bancario* element asks whether "a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state."[151] The Buyer relies on three forum-directed acts, all of which involve BlueTech. Because BlueTech and its PAA registrations were integral to the conspiracy and its long-term goal of selling EPA-registered PAA products in competition with the Company, those forum-directed acts satisfy the third *Istituto Bancario* element.

First, Mike acquired BlueTech, a Delaware entity, to gain access to EPA registrations for PAA-related products. Forming a Delaware entity satisfies the

---

[151] *Id.*

requirement of a substantial forum-directed act when the formation bears a sufficient nexus to the cause of action.[152] In *Sternberg v. O'Neil*, the Delaware Supreme Court held that for jurisdictional purposes, no distinction existed between forming a Delaware entity and acquiring 100% ownership of a Delaware entity.[153]

A sufficient nexus to the cause of action exists when the formation of the entity was "an integral component of the total transaction."[154] The "integral component" language comes from *Papendick*, where the Delaware Supreme Court examined whether the formation of a Delaware entity created sufficient minimum contacts to support personal jurisdiction in Delaware over the party forming it.[155] Issued just two

---

[152] *E.g.*, *Papendick v. Robert Bosch GmbH*, 410 A.2d 148, 152 (Del. 1979); *Reid v. Siniscalchi*, 2014 WL 6589342, at *10 (Del. Ch. Nov. 20, 2014); *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *9 (Del. Ch. Oct. 31, 2013); *Conn. Gen. Life Ins. v. Pinkas*, 2011 WL 5222796, at *2 (Del. Ch. Oct. 28, 2011); *Cairns v. Gelmon*, 1998 WL 276226, at *3 (Del. Ch. May 21, 1998). *See generally* 1 Wolfe & Pittenger, *supra*, § 3.04[c][4] ("[I]n suits in which the incorporation of a Delaware subsidiary is an integral component of the conduct giving rise to the cause of action, the Delaware courts have consistently recognized that a nonresident defendant's incorporation of such subsidiary constitutes constitutionally sufficient 'minimum contacts' with Delaware.").

[153] *Sternberg v. O'Neil*, 550 A.2d 1105, 1107–08 (Del. 1988), *abrogated on other grounds by Genuine Parts Co. v. Cepec*, 137 A.3d 123 (Del. 2016).

[154] *Harris*, 289 A.3d at 305 (quoting *Lone Pine Res., LP v. Dickey*, 2021 WL 2311954, at *5 (Del. Ch. June 7, 2021) (cleaned up)); *see, e.g.*, *Dow Chem. Co. v. Organik Kimya Hldg. A.S.*, 2017 WL 4711931, at *8 (Del. Ch. Oct. 19, 2017) ("[T]he formation must be an integral component of the total transaction to which plaintiff's cause of action relates." (cleaned up)); *Reid*, 2014 WL 6589342, at *10 ("When done as an integral part of a wrongful scheme, the formation of a Delaware entity confers personal jurisdiction under the long-arm statute.").

[155] *Papendick*, 410 A.2d at 152.

39

years after *Shaffer v. Heitner*,[156] *Papendick* rejected the defendants' argument that forming a subsidiary was indistinguishable from merely owning shares, which the Supreme Court of the United States held in *Shaffer* did not provide sufficient minimum contacts to support jurisdiction. The Delaware Supreme Court held that forming a Delaware entity created sufficient minimum contacts because it involved purposeful activity that took advantage of the benefits of using Delaware law.[157]

Mike's agreement to buy BlueTech in November 2022 was a key part of the wrongful scheme to misappropriate the Company's trade secrets, then to compete with the Company using that information. The Company's principal products used EPA-registered PAA. Mike, Phil, and Aaron wanted to compete with the Company's EPA-registered PAA products. To do that, they needed EPA registrations for PAA products. Mike bought BlueTech to gain access to EPA registrations. Acquiring BlueTech was a substantial forum-directed act sufficient to support jurisdiction.

The conspiracy also involved keeping Mike's acquisition of BlueTech secret from the Buyer. That led to filings with the Delaware Secretary of State, which is a jurisdictional act that satisfies the Long-Arm Statute.[158] To keep his involvement

---

[156] 433 U.S. 186 (1977).

[157] *Papendick*, 410 A.2d at 152.

[158] *E.g.*, *Fläkt Woods*, 56 A.3d at 1027 (certificate of cancellation); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 635 (Del. Ch. 2013) (various certificates required by DGCL for challenged transactions, including certificates of amendment, certificates of designation, certificates of correction, and certificate of cancellation), *abrogated on other grounds by El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152

with BlueTech secret, Mike listed his stepson's then-girlfriend—who did not have the last name of Harvey—as the managing member for the acquisition vehicle.[159] Mike engaged in Delaware-directed activity when he caused the entity's registered agent to update the information on file with the Secretary of State. That filing was a substantial act in support of the conspiracy because Mike used the filing to conceal his involvement. It too supplies a forum-directed act.

Getting BlueTech's EPA registrations to the point where they could be used to compete with the Company resulted in additional Delaware-directed activity. Sending mail to a jurisdiction can constitute a jurisdictionally significant act.[160] To clean up the registrations, Mike created product labels,[161] prepared safety data sheets,[162] and made regulatory filings.[163] Mike used a Delaware address for those

---

A.3d 1248, 1264 (Del. 2016) (rejecting *Carsanaro's* analysis of post-merger derivative standing); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at \*8 (Del. Ch. Feb. 4, 2005) (certificate of designations); *Gibralt Cap. Corp. v. Smith*, 2001 WL 647837, at \*6 (Del. Ch. May 9, 2001) (certificate of designations); *Crescent/Mach I*, 846 A.2d at 977 (certificate of merger). *See generally* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 13.4[B], at 13-14 (4d ed. 2021 & supp. 2025) ("The filing of corporate instruments with the Delaware Secretary of State may also constitute an action in Delaware sufficient to support jurisdiction.").

[159] *See* Mike Tr. 104; JX 492; JX 494; JX 532.

[160] *See Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172, 177 (3d Cir. 2006) ("[M]ail . . . can constitute purposeful contacts when sent into the forum.").

[161] *See* JX 604 at 2.

[162] *See* JX 488 at 1; JX 587 at 1.

[163] *See* JX 602 at 1; JX 504; JX 645 at 3, 8.

41

activities and had BlueTech's mail sent to that address.[164] The mailings were a meaningful part of the conspirators' efforts to bring EPA-registered PAA products to market and compete with the Company using the trade secrets they misappropriated. The use of a Delaware address was another substantial act in support of the conspiracy that satisfies the *Istituto Bancario* requirement.

## D. Knowledge And Foreseeability

The fourth and fifth elements of the *Istituto Bancario* test ask whether the defendant "knew or had reason to know of" substantial forum-directed activity and the degree to which the forum-directed activity was "a direct and foreseeable result of the conduct in furtherance of the conspiracy."[165] Phil and Aaron knew or had reason to know about the secret purchase of BlueTech and Mike's efforts to keep the purchase secret from the Company. Indeed, Mike asked Phil and Aaron to lie about who purchased BlueTech by saying that Capacity Chemical purchased it. Aaron responded, "Absolutely."[166]

Phil and Aaron also knew about the efforts to commercialize the BlueTech PAA registrations, including the product labels,[167] safety data sheets,[168] and regulatory

---

[164] *See* JX 954 at 2; JX 957 at 2.

[165] *Istituto Bancario*, 449 A.2d at 225.

[166] JX 614.

[167] *See* JX 604 at 2.

[168] *See* JX 488 at 1; JX 587 at 1.

filings[169] that were routed through Delaware and bore BlueTech's Delaware address on the front page. After Mike obtained OMRI certification for BlueTech's Oxy 5 product,[170] he immediately forwarded the certification to Phil and Aaron, writing: "Here we go! . . . I would think we can commercialize this in a couple weeks."[171] They planned for Capacity Chemical to sell the product as soon as possible.[172] Soon after receiving the OMRI certification, Aaron emailed nearly a dozen Company customers, telling them about "our . . . 5.6% PAA called Oxy 5."[173]

Phil and Aaron testified at trial that they were not involved in or aware of any Delaware filings or Delaware-directed acts. That testimony was not credible. They knew Mike purchased BlueTech, knew about Mike's efforts to conceal his ownership, and received Delaware-address-bearing paperwork. They may not have actually known about the registered agent filing, but they had reason to know about it. The Delaware-related effects were foreseeable results of the effort to use BlueTech's EPA registrations to compete with the Company.

---

[169] *See* JX 602 at 1; JX 504; JX 645 at 3, 8.

[170] JX 619.

[171] *Id.*

[172] JX 620 (Mike then emailed Binfield, telling him: "This product can be available from Westley as early as next week. . . . The boys (Phil and Aaron) will be selling it sooner than later.").

[173] *See* JX 621; JX 622; JX 624; JX 625; JX 630; JX 648; JX 649; Aaron Tr. 423–25.

### E. Personal Jurisdiction Exists.

The Buyer proved the facts necessary to support personal jurisdiction over Phil and Aaron. Phil and Aaron knowingly participated in a conspiracy with Mike that involved substantial acts in Delaware in furtherance of the conspiracy. Because Phil and Aaron are the legal principals of Capacity Chemical and Mike is a de facto principal, their knowledge and acts are attributed to Capacity Chemical.[174] Capacity Chemical is also part of the conspiracy and subject to jurisdiction in Delaware.

Phil and Aaron argue that because the Delaware-directed acts post-dated their departure from the Company, those acts cannot support personal jurisdiction for purposes of the breach of fiduciary duty claims. The court need not reach that issue. "[O]nce a valid claim has been brought and personal jurisdiction established over a party defending a proper claim, . . . Delaware courts are justified in asserting personal jurisdiction over the defending party where the subject matter of the claim is sufficiently related to the plaintiff's independent claims."[175] When "many of the same acts and factual circumstances" form the bases for both the claim over which

---

[174] *See Lake Treasure Hldgs., Ltd. v. Foundry Hill GP LLC*, 2013 WL 6184066, at \*4 (Del. Ch. Nov. 21, 2013); *Hospitalists of Del., LLC v. Lutz*, 2012 WL 3679219, at \*8–9 (Del. Ch. Aug. 28, 2012) (citing 1 Wolfe & Pittenger, *supra*, § 3.05[b]).

[175] *Fitzgerald v. Chandler*, 1999 WL 1022065, at \*4 (Del. Ch. Oct. 14, 1999) (internal quotation marks omitted); *see SPay, Inc. v. Stack Media Inc.*, 2021 WL 6053869, at \*4–5 (Del. Ch. Dec. 21, 2021) (exercising jurisdiction because "claims are sufficiently related for personal jurisdiction purposes"); *Canadian Com. Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at \*11–12 (Del. Ch. Feb. 22, 2006) (exercising jurisdiction where claims "depend on a number of the same facts"). *See generally Harris*, 289 A.3d at 297–98.

the court can exercise personal jurisdiction and the claim where personal jurisdiction is contested, then the claims are sufficiently "interwoven" to warrant exercising personal jurisdiction over the defendant for purposes of the latter claim.[176] "Delaware public policy favors Delaware courts assuming personal jurisdiction over parties in order to adjudicate claims which sufficiently relate to other claims which do properly bring the party within those courts' jurisdiction."[177] Doing so serves policy interests in "achiev[ing] judicial economy and avoid[ing] duplicative efforts among courts in resolving disputes."[178]

The breach of fiduciary duty claims against Phil and Aaron arise out of the same ongoing course of conduct that supports jurisdiction over other claims in the case. Through their breaches of fiduciary duty, Phil and Aaron took trade secrets that they used in furtherance of the conspiracy. The court therefore can exercise jurisdiction over Phil and Aaron for purposes of the breach of fiduciary duty claim.

## III.   THE TRADE SECRET CLAIM

The Buyer proved at trial that Mike, Phil, and Aaron misappropriated the Company's trade secrets.

---

[176] *Fitzgerald*, 1999 WL 1022065, at *5.

[177] *Id.* at *4; *accord SPay*, 2021 WL 6053869, at *5.

[178] *Fitzgerald*, 1999 WL 1022065, at *4.

## A.      Does DUTSA Apply?

The defendants argue that they cannot be liable for trade secret misappropriation because the Buyer only invoked the Delaware Uniform Trade Secrets Act ("DUTSA"). They point out that DUTSA does not apply extraterritorially and all the defendants' acts took place in California.[179] That argument is "really a choice-of-law argument in disguise."[180]

When faced with a choice-of-law issue, a Delaware court applies a two-step test. First, the court determines whether there is an actual conflict between the law of the competing jurisdictions.[181] If there is no conflict, then the court can apply Delaware law. If there is a conflict, then the court applies the law with the most significant relationship to the dispute.[182]

---

[179] *See Focus Fin. P'rs, LLC v. Holsopple*, 250 A.3d 939, 970–71 (Del. Ch. 2020) (dismissing claim under DUTSA where none of the conduct occurred in Delaware).

[180] *Dow Chem. Co. v. Organik Kimya Hldg. A.S.*, 2018 WL 2382802, at *5 (Del. Ch. May 25, 2018). If the defendants had raised the choice-of-law issue earlier, then the court likely would have required the parties to apply California law. Mike, Phil, and Aaron are California residents, and Capacity Chemical is a California entity. Mike, Phil, and Aaron took the Company's information at its Modesto site in California. Capacity Chemical's principal place of business is in California. It therefore would have been preferable to litigate the case under California law, but the defendants waited until too late to raise the issue as a "gotcha" defense.

[181] *Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1050 (Del. 2015).

[182] *Id.*

If Delaware law did not apply here, then California law would apply. Delaware and California have both adopted the Uniform Trade Secrets Act.[183] The defendants have not identified material conflicts between Delaware and California trade secret law. The court therefore applies DUTSA.

## B. The Information Qualified As Trade Secrets.

DUTSA defines a "trade secret" as

information, including a formula, pattern, compilation, program, device, method, technique or process, that:

a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[184]

The definition of a trade secret thus has two elements. The information must (1) derive independent economic value from being kept secret and (2) have been subject to adequate efforts at protection.

---

[183] *DVD Copy Control Assn., Inc. v. Bunner*, 75 P.3d 1, 9 (Cal. 2003) ("California has adopted without significant change the Uniform Trade Secrets Act (UTSA)."); *Alarm.com Hldgs., Inc. v. ABS Cap. P'rs Inc.*, 2018 WL 3006118, at *9 (Del. Ch. June 15, 2018) ("Delaware modeled DUTSA on the Uniform Trade Secrets Act."), *aff'd*, 204 A.3d 113 (Del. 2019) (TABLE). *See generally* 6 *Del. C.* § 2008 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it.").

[184] 6 *Del. C.* § 2001(4).

47

## 1. Economic Value

To satisfy the economic value element, the information must derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."[185] The valuable information can be a "combination of steps into a process . . . , even if all the component steps are known, so long as it is a unique process which is not known in the industry."[186] When evaluating whether a compilation of publicly available information has independent value, a court will consider the effort that was expended to create the compilation or that would be necessary to recreate it.[187]

### a. The Formulas

Under DUTSA, the definition of a trade secret includes "formula" and "compilation."[188] The Harveys collectively absconded with (i) a compilation of 1,051

---

[185] *Id.*

[186] *Elenza, Inc. v. Alcon Lab'ys Hldg. Corp.*, 183 A.3d 717, 721 (Del. 2018) (internal quotation marks omitted).

[187] *See, e.g.*, *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 594 (Del. Ch. 2010) (crediting the finding "that a competitor could not have generated a similar system without expending a comparable amount of time and money"), *aff'd sub nom.*, *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *AirFacts, Inc. v. de Amezega*, 909 F.3d 84, 96 (4th Cir. 2018) (company whose employee "spent months compiling" publicly available data "in particular groupings and . . . in a useful format" could claim trade secret protection over the compilation because of that employee's "painstaking" effort).

[188] 6 *Del. C.* § 2001(4).

formulas Mike took from the Company and later sent to Phil and Aaron,[189] (ii) a compilation of 220 formulas Aaron downloaded from the Company's database,[190] and (iii) a quaternary ammonium neutralizer formula that Mike sent to a collaborator on his last day.[191] Those formulas had independent economic value.[192]

---

[189] JX 558; JX 559; JX 560; JX 983; PTO ¶¶ 83–84.

[190] Aaron Tr. 437; Donabed Tr. 591.

[191] *See* PTO ¶ 49; JX 396.

[192] As a side note, Mike claims that three binders he took from his office contained formulas owned by Amcor Manufacturing. Mike Tr. 186. After forming the Company in 1991, Mike formed Amcor in 1995 to act as the Company's formulary. Amcor wound down operations in 2001, and the Company began acting as its own formulary. Mike contends that Amcor assembled the formulas and that when its operations wound down, there was never any formal purchase or licensing agreement under which the Company obtained rights to Amcor's property. *Id.* at 127–28.

Mike's sudden realization that the Company did not own its intellectual property is not credible. The Company operated for more than twenty years using what Mike now claims are the Amcor formulas. The confidential information memorandum circulated to potentially interested parties stated that the Company had developed an "expansive IP portfolio" characterized by "[u]nique compositions" and "proprietary formulations." JX 906 at 6, 37. In the Sale Agreement, the Company represented that it owned all the intellectual property "necessary for the operation of the business . . . as currently conducted." SPA § 4.16(c). When Mike worked as the Buyer's employee, he suggested that the Company could sell a collection of its low-margin formulas for $5,000 per formula. JX 126 ("The products are indeed generic . . . . The option they liked was to buy the formulas for $5,000 each. They have chosen 21 of the ones they currently like and use. . . . Normally I would just approve this transaction. . . .[T]here is no downside to selling these formulas."). There was plainly a de facto transfer of ownership to the Company, and it is far too late for Mike to claim otherwise.

49

The Company's formulas "represent years of accumulated technical knowledge, testing, customer feedback, research, and trial and error."[193] They include "raw material and pricing information and specific formulation percentages to the hundredth decimal point."[194] In an email to Aaron, Mike noted that "MANY of the formulas have more detailed information in the 'comments' section, often times detailing how it is used, and feed rates or field testing parameters."[195]

At trial, Mike contended that the formulas were generic and publicly available,[196] and the defendants did show that some of the formulas were either publicly available or obtainable from customers. That showing did not undercut the economic value of the other Company formulas or the compilation as a whole. Furthermore, even when the Company used publicly available formulas as a starting point, the Company generated its own products through an iterative process of reformulating, refining, and testing.[197] The Company's formulas were the "lifeblood

---

[193] JX 906 at 12.

[194] *Id.*

[195] JX 558; *see, e.g.*, JX 559 at 240 (showing detailed comments on the order of mixing ingredients, duration of each step, and cautionary notes); JX 934 at 157 (cautioning on the duration of mixing ingredients).

[196] Dkt. 333 at 37–38 [hereinafter Defs.' Opening Br.]; Mike Tr. 85–86 (agreeing that "any high schooler could create the formulas"); *id.* at 120–30 (stating that the formulas "are quite generic"); JX 961 at 2 (Mike stating in an interview with the Buyer's expert that formulas are "a dime a dozen").

[197] *See* Hird Tr. 489 ("And so I think we would start looking at one of the Flick books as a base formula. And the emulsifying chemical in that either wasn't available

50

of [the] company."[198] While working as the Buyer's employee, Mike suggested that the Company could sell its "generic" formulas for $5,000 each.[199] Both the formulas themselves and the compilation had independent economic value.

### b. Business Information

Under DUTSA, a trade secret can consist of any kind of "information."[200] The Harveys took spreadsheets with comprehensive information on the Company's products, customers, suppliers, sales, raw material sourcing, and pricing.[201] The information about the Company's major customers included the products each

---

or for some reason just wasn't good enough. So Mike helped both recommend an emulsifier and helped us provide the vendor to get a sample delivered of that emulsifier more quickly."); *id.* at 502 ("And once you have a base formulation, you'll identify what testing you need to make sure that it's going to be fit for purpose. Sometimes we actually call it FFP testing, fitness for purpose testing."). The defendants contend that the existence of formula reference books like the "Flick books" show that the Company's formulas are not trade secrets. That is not correct. The "Flick books" are the five volumes of *Advanced Cleaning Product Formulations* by Ernest Flick. *See* JX 939; JX 940; JX 941; JX 942; JX 943. They are less precise than the Company's formula sheets and do not contain pricing information. The Company's chemists used those reference works as starting points and then spent hours engaging in iterative modifications and testing to develop saleable products that met customer needs and were profitable. *See* Donabed Tr. 565, 577; *see also* JX 906 at 17.

[198] Rinaldi Tr. 15; Donabed Tr. 564.

[199] JX 126 ("The products are indeed generic . . . . The option they liked was to buy the formulas for $5,000 each. They have chosen 21 of the ones they currently like and use. . . . Normally I would just approve this transaction. . . .[T]here is no downside to selling these formulas.").

[200] 6 *Del. C.* § 2001(4).

[201] *E.g.*, JX 146; JX 151; JX 153; JX 383; JX 385; JX 441; *see* JX 906 at 14.

customer had ordered, any customer-specific specifications, and the order quantity, net weight, standard cost, last order date, and hazard label text for each product.

That information has obvious value because it gives a competitor detailed insight into the Company's market presence. A competitor can use that information to solicit the Company's customers, undercut the Company's pricing, and interact with potential customers as if they had longtime relationships.[202]

The Harveys also took a spreadsheet identifying products the Company sold in 2021 and during the first half of 2022 that included the raw materials, manufacturing equipment, volumes, customer requirements, company contacts, and cost of goods sold.[203] They took spreadsheets identifying revenues, costs, and gross profits for each of the Company's products.[204] They also took spreadsheets containing information for more than 2,500 suppliers.[205] That comprehensive information enables a startup to act as if it had been operating as a successful business.[206]

The defendants contend that the information about suppliers, sales, and pricing is not a trade secret because the information is outdated and could be developed by proper means. Much of the information was current when the Harveys

---

[202] *See* JX 906 at 14.

[203] *See* JX 146; JXs 381–86.

[204] Donabed Tr. 593–95; *see, e.g.*, JX 145; JX 451.

[205] *See* JX 381.

[206] JX 906 at 14.

52

took it. Regardless, historical business information has economic value where, as here, a competitor can use the information to target customers who have shown a willingness to buy a particular service or product. That information is particularly valuable where, as here, it contains the data needed to undercut the competition. That someone could figure out some of the information using lawful means does not undercut the value of the mountain of information that the Harveys misappropriated.

The Buyer has proved that the business information had independent economic value.

### c. Product Labels And Data Sheets

Under DUTSA, a trade secret can consist of a "compilation."[207] The Harveys took a compilation of product labels numbering in the thousands. They also took a compilation of safety data sheets and technical data sheets.

The product labels, safety data sheets, and technical data sheets are publicly available, but their value here lies in the compilation, which would take much time and effort to replicate.[208] The Company also maintained this information in a manner

---

[207] 6 *Del. C.* § 2001(4).

[208] *See* Howard Tr. 792; JX 906 at 4–5, 14–15; Dkt. 331 Ex. G at 18. Donabed testified that the Company expended "an extreme amount of time" and resources "organizing [the labels] so they're broken down based on our products and our customers." Donabed Tr. 598. The compilation the Company created and the Harveys took allowed them to "find out [which of the Company's] customers are purchasing these different products," and "then use [the Company's] design to . . . essentially sell the same product with the same label, with a different branding on it." Donabed Tr. 598.

that was coordinated and cross-referenced with customer and supplier information, which the Harveys also took.[209] The compilation gained additional value because it was laboriously organized for operational use and for interactions with suppliers and customers.[210] Having the ability to respond quickly to customers and suppliers provides a competitive advantage. After taking the compiled information, Aaron used it regularly by attaching the Company's data sheets to emails in which he provided Capacity Chemical price quotes to the Company's customers.[211]

The Buyer has proved that the compilations of product labels, safety data sheets, and technical data sheets had independent economic value.

### d. Photographs Of The Company's Site

To reiterate, under DUTSA, a trade secret can consist of any kind of "information."[212] The Harveys took photographs of the Company's facilities that gave them detailed information about the Company's manufacturing equipment, processes, and layout. That information has value because a competitor can see what equipment a company has and how the company uses it. A competitor can quickly set

---

[209] *See, e.g.*, JX 441.

[210] *See, e.g.*, JX 488; JX 587; JX 937; JX 947; *see* Donabed Tr. 602 (emphasizing "the amount of labor and time that just went into creating and organizing these [safety data sheets]"); Aaron Tr. 446–47 (Aaron testifying that he and other Company employees built those compilations of documents "for years").

[211] *See, e.g.*, JX 548; JX 572; JX 573; JX 588.

[212] 6 *Del. C.* § 2001(4).

up a facility without expending resources on the design, layout, or necessary equipment.[213] The Buyer established that the pictures the Harveys took had independent economic value.

## 2. Adequate Protection

A trade secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."[214] The protective measures only need to be reasonable. The measures need not be impenetrable.[215] "[F]ailure to employ the fullest range of protective techniques will not terminate the secrecy provided that the techniques employed were, in the circumstances, reasonably prudent."[216]

---

[213] *See* JX 906 at 5 ("Such information feeds directly into planning for everything from equipment maintenance to expansion and asset utilization. Access to this information allows a competitor to scale manufacturing equipment, leverage the knowledge in approaching customers to woo them away from their current supplier, and to manage competing production.").

[214] 6 *Del. C.* § 2001(4)(b).

[215] *See* 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.04, LexisNexis (database updated Dec. 2025) ("Among things to be considered are the size and character of the enterprise (generally, large, sophisticated enterprises are held to a higher 'secrecy effort' standard), the location of the enterprise (elaborate steps that may be required in an 'industrially dense' area may not be required in, say, a rural area) and the nature and character of the enterprise's staff. Steps that are commonly employed by large enterprises, such as the use of employment agreements with confidentiality provisions and/or restrictive covenants, restricted access, computer passwords, to attain access, legending and keeping documents under lock and key, are scrutinized by courts to assess whether reasonable safeguards have been employed.").

[216] *Id.* § 1.04[2].

The Company used reasonable efforts to protect its trade secrets, including employee training,[217] access restrictions,[218] a secure IT environment,[219] shredding of documents after use,[220] keycard-controlled gates,[221] and a ban on on-site photography.[222] The Company kept its spreadsheets and formulas in its restricted-access Chempax system.[223] The Harveys own actions highlighted that the Company kept its information protected, because they took information from restricted-access folders that they had the credentials to access.[224] The Company's expert opined persuasively that the Company's measures to protect its trade secrets were comprehensive and consistent with industry standards.[225]

---

[217] Donabed Tr. 564 ("Absolutely, 100 percent. All of my employees are trained on [maintaining the confidential and proprietary nature of chemical formulas], as well as anybody else that may have access. They know that formulas stay within our system internally."); *see also* Hird Tr. 498; Donabed Tr. 571–72.

[218] Anderson Dep. 38–40 (IT employee describing "security rules based on job function" and "role-based access control").

[219] The Company protected its electronic systems with firewalls, password requirements, cyber awareness training, email security gateways, multi-factor authentication requirements, and data encryption. *See* Anderson Dep. 36, 38–40; JX 143; JX 784; Howard Tr. 781.

[220] Donabed Tr. 569; Hird Tr. 497.

[221] Donabed Tr. 563; *see also* Hird Tr. 497; Donabed Tr. 571.

[222] Donabed Tr. 569–70.

[223] Hird Tr. 496–97.

[224] *Id.* at 492, 496–97; Donabed Tr. 572, 573; Rinaldi Tr. 20.

[225] Howard Tr. 780–81.

As with the economic value of the trade secrets, this is another area where Mike has changed his tune. Before this litigation, Mike was "very protective" of the formulas and "engrained it into" the Company's chemists that they "must keep them secret."[226] In the Sale Agreement, he represented that the Company takes "all actions reasonably necessary and all actions common in the industry to maintain and protect . . . the secrecy, confidentiality and value of trade secrets and other confidential information of the Company."[227] The Sale Agreement also required that the Company safeguard its intellectual property between signing and closing.[228] If Mike's positions at trial were correct, then he committed fraud and breached the Sale Agreement.

The Company took adequate measures to protect its trade secrets.

## C. The Harveys Engaged In Misappropriation.

Under DUTSA, "misappropriation" means "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."[229] DUTSA identifies a non-exhaustive list of "improper means," which includes "theft, bribery, misrepresentation, breach or inducement of

---

[226] Donabed Tr. 565, 577.

[227] SPA § 4.16(g); *see* Rinaldi Tr. 15–16.

[228] The agreement required Mike to "cause the Company not to . . . divulge, furnish to or make accessible . . . any trade secrets . . . to any third party who is not subject to an agreement entered into in the ordinary course of business to maintain the confidentiality of such trade secrets." SPA § 7.1(b)(ii).

[229] 6 *Del. C.* § 2001(2)(a).

a breach of a duty to maintain secrecy, or espionage through electronic or other means."[230]

Mike, Phil, and Aaron all took information while serving as Company employees. In that capacity, they owed a fiduciary duty to protect the Company's confidential information, including its trade secrets.[231] Taking Company information for their own ends breaches that duty. Therefore, the taking was improper and constituted misappropriation under DUTSA.

## D. Capacity Chemical And BlueTech Engaged In Misappropriation.

Under DUTSA, "misappropriation" includes the "[d]isclosure or use of a trade secret of another without express or implied consent by a person who" either "[u]sed improper means to acquire knowledge of the trade secret" or "[a]t the time of disclosure or use, knew or had reason to know that [their] knowledge of the trade was . . . [d]erived from or through a person who had utilized improper means to acquire it."[232]

Mike, Phil, and Aaron misappropriated the Company's trade secrets on Capacity Chemical's behalf. Because Mike, Phil, and Aaron used improper means to

---

[230] *Id.* § 2001(1). *See generally* Unif. Trade Secrets Act § 1 cmt. (Unif. L. Comm'n, amended 1985).

[231] *See* Part VI, *infra.*

[232] 6 *Del. C.* § 2001(2)(b).

58

acquire the Company's trade secrets, Capacity Chemical used improper means to acquire the Company's trade secrets. The same is true for BlueTech.

After Mike, Phil, and Aaron obtained the Company's trade secrets, Capacity Chemical used the trade secrets to conduct its business, often acting through Aaron, Phil, or Mike. Because Phil and Aaron are the legal principals of Capacity Chemical and Mike is a de facto principal, their knowledge and acts are attributed to Capacity Chemical.[233] Capacity Chemical therefore knew that the trade secrets were derived from or through persons who had used improper means to acquire them. The same is true for Mike and BlueTech.

Capacity Chemical and BlueTech also engaged in misappropriation.

---

[233] *See Tchrs.' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006) ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) (imputing knowledge of member-employees to limited liability companies); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 153–55 (Del. Ch. 2004) (imputing fraud claims to corporation where it designated a manager of a limited liability company and where the manager made fraudulent statements); *see also* 3 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 790, Westlaw (database updated Sep. 2025) ("[T]he general rule is well established that a corporation is charged with constructive knowledge . . . of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation." (footnote omitted)).

## E. Joint And Several Liability

"Joint and several liability is the standard for trade secret claims."[234] Mike, Phil, Aaron, Capacity Chemical, and BlueTech are jointly and severally liable for misappropriating trade secrets.

## F. Standing

The defendants argue that the Buyer lacks standing to assert claims under DUTSA because the Company owned the trade secrets, not the Buyer. Although under strict principles of corporate law, the Buyer as stockholder has no interest in the Company's specific property, that technical rule does not apply to trade secret misappropriation. For purposes of trade secret claims, courts have held that a parent corporation has a property interest—effectively a beneficial interest—in its wholly owned subsidiary's trade secrets sufficient to support standing.[235] That makes practical sense, because the parent of a solvent, wholly owned subsidiary suffers 100% of the loss in value when the subsidiary suffers harm.

---

[234] *Compulife Software, Inc. v. Newman*, 111 F.4th 1147, 1154 (11th Cir. 2024); *id.* at 1164 (emphasizing "the breadth of the presumption in favor of joint and several liability" for trade secrets claims); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1218 (N.D. Cal. 2012) ("Commentators on trade secrets law [] suggest that, in general, liability for misappropriation claims is joint and several.").

[235] *See Applied Materials, Inc. v. Adv. Micro-Fabrication Equip. (Shanghai) Co., LTD*, 2009 WL 10692715, at *3 (N.D. Cal. Nov. 30, 2009) (holding that "[a] parent corporation has an ownership interest in the trade secrets of its wholly owned subsidiary"); *Cedars Sinai Med. Ctr. v. Quest Diagnostic Inc.*, 2019 WL 12521480, at *4 (C.D. Cal. Aug. 9, 2019) ("[P]ossession of a trade secret, rather than ownership[,] is sufficient for a party to assert a trade secret misappropriation claim." (emphasis omitted)).

The Buyer owns 100% of the Company. The Buyer suffered the full extent of the Company's injury through its 100% ownership. The Buyer therefore suffered an injury sufficient to give it standing to pursue claims under DUTSA.

## G. Relief Under DUTSA

DUTSA authorizes a wide range of relief, including injunctive relief, compensatory damages, exemplary damages, and expense shifting (including attorneys' fees).[236] The Buyer did not seek injunctive relief under DUTSA, so this decision does not consider that possibility. This decision awards the other categories of relief.

### 1. Compensatory Damages Under DUTSA

DUTSA allows the court to award damages for losses suffered and for unjust enrichment. The operative language states:

> Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.[237]

The monetary remedy should address the period during which information is entitled to trade secret protection, "plus the additional period, if any, in which a

---

[236] 6 *Del. C.* §§ 2002–2004.

[237] *Id.* § 2003(a).

61

misappropriator retains an advantage over good faith competitors because of misappropriation."[238] As long as there is no double counting, an injured party can recover both its actual losses and the misappropriator's unjust benefit.[239] In the alternative, DUTSA allows an award of damages measured by what a reasonable royalty would have been, as long as "competent evidence" supports the amount.[240]

### a. Damages For Actual Loss

The damages calculation under DUTSA begins with "the actual loss caused by misappropriation."[241] The Buyer's expert did not compute a number for lost profits from losing customers to Capacity Chemical.[242] The defendants' expert opined that the Buyer suffered $0.9 million in lost profits.[243] The Buyer is entitled to that amount.

### b. Damages For Unjust Enrichment

The damages calculation under DUTSA does not stop with the actual loss. It can also include "the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."[244] The Buyer proved that Mike, Phil, Aaron,

---

[238] Unif. Trade Secrets Act § 3 cmt. (Unif. L. Comm'n, amended 1985).

[239] *Id.*

[240] *Id.*

[241] 6 *Del. C.* § 2003(a).

[242] JX 905 at 42; Bersin Tr. 116–17.

[243] JX 911 at 8, 36.

[244] *Id.*

Capacity Chemical, and BlueTech benefited in the amount of $24,224,125.59 in avoided costs.[245]

The Buyer proved its avoided costs calculation through a combination of fact and expert testimony. Fact witnesses testified to the extensive work that would be needed to recreate the formulas,[246] noting that the time involved is typically measured in years.[247] That testimony was credible. The Buyer's expert used the evidence to estimate the costs Capacity Chemical saved. His method was conservative in that he only valued a subset of the trade secrets that the Harveys took, in part because of "the sheer volume of the information."[248] He also only evaluated the formulas the Company owned. He did not attribute value to the formulas that the Company did not own, even though the Company's compilation of the many non-owned formulas has value as a trade secret.[249] His method was also conservative

---

[245] This figure reflects $22,858,512.60 for the formulas Mike stole, $1,315,953.03 for the non-duplicative formulas Aaron stole, and $49,659.96 for the quaternary ammonium neutralizer formula, plus the product labels, safety data sheets, and technical data sheets. JX 906 at 3–4.

[246] *See* Hird Tr. 502–29; Donabed Tr. 579–88.

[247] Hird Tr. 503; *see* Phil Dep. 59, 64–65 (Apr. 14, 2025) (discussing product that would take two years to develop).

[248] Howard Tr. 792, 793–94 ("It's such a large amount of information . . . . I don't know how I would get a number, a valuation number for all of them and be able to come to court and say how I arrived at it."); *see also* Howard Tr. 777; Donabed Tr. 603–04; JX 906 at 14.

[249] *See* JX 906 at 17, 20.

because he only accounted for labor costs and not for the capital expenditure required to develop and commercialize the formulas.[250]

### c. The Royalty-Based Damages Alternative

As an alternative measure for both actual loss and unjust enrichment, the Buyer seeks damages in the form of a reasonable royalty.[251] This is not an apt case for a royalty-based alternative.

A royalty-based calculation attempts to reproduce the amount the defendant would have paid to license the plaintiff's trade secrets in a hypothetical negotiation just before the misappropriation began.[252] To calculate a reasonable royalty, a court should consider (1) "the resulting and foreseeable changes in the parties' competitive posture"; (2) "th[e] prices past purchasers or licensees may have paid"; (3) "the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business"; (4) "the nature and extent of the use the defendant intended for the secret"; and (5) "other unique factors in the

---

[250] *See* JX 906 at 15.

[251] 6 *Del. C.* § 2003(a); *see Sorrento Therapeutics, Inc. v. Mack*, 2025 WL 2172268, at *13 n.104 (Del. Ch. July 31, 2025) (stating that DUTSA does not "require[] actual damages and unjust enrichment to be unprovable before a reasonable royalty may be awarded").

[252] *See Cal. Safe Soil, LLC v. KDC Agribusiness, LLC*, 2025 WL 98479, at *28 (Del. Ch. Jan. 10, 2025), *aff'd*, 2025 WL 2803792 (Del. Oct. 2, 2025) (TABLE); 15 Business Organizations with Tax Planning § 235.06[2][e] (2026).

particular case which might have affected the parties' agreement, such as the ready availability of alternative processes."[253]

This case is not an apt scenario for a royalty-based calculation because the Harveys effectively took all the information about the Company business, seizing for themselves what the Buyer's expert referred to as a "company in a box."[254] That led the Buyer's expert to value the royalty by performing what amounts to a valuation of the Company, then assuming Capacity Chemical would capture 20% of its value.

To his credit, the Buyer's expert made conservative assumptions. He used a forecasting period of ten years, despite evidence that the Company's customer relationships typically last fifteen to twenty years.[255] He started with the Company's 2022 revenue of $107 million and assumed revenue growth of 13.7% during an initial projection period of four years.[256] He then assumed revenue growth rates of 3.7% to 4% for the balance of the projection period, consistent with the assumptions the Buyer used when acquiring the Company.[257] He introduced an annual customer attrition rate of 7.5%, which was conservative given that the Company's historic attrition rate

[253] *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974); *accord Sorrento*, 2025 WL 2172268, at *14–17 (analyzing a reasonable royalty for misappropriated trade secrets based on the *University Computing* factors).

[254] Bersin Tr. 818.

[255] *Id.* at 827–28; JX 905 at 51.

[256] Bersin Tr. 825–26; JX 905 at 51.

[257] Bersin Tr. 829–30; JX 905 at 51–52.

was 5%.[258] He estimated the Company's gross profit each year using its gross profit margin of 48.9% in 2022.[259] He then discounted his figures to present value using a 12% discount rate, which reflects his calculation of the Company's weighted average cost of capital.[260] Finally, he assumed that Capacity Chemical would capture 20% of the Company's time-adjusted gross profit each year, viewing that estimate as conservative relative to Capacity Chemical's revenue growth rate of 181% from 2023 to 2024, its ongoing business relationships with forty-four Company customers, and its demonstrated intent to sell PAA-registered products.[261] That estimate totals $66,349,748 in damages.[262]

Although the Buyer's expert took a conservative approach, there are too many variables in his analysis to use the royalty method in lieu of the defendants' actual damages measure and the Buyer's avoided costs measure. The 20% capture per year is the biggest variable. The expert essentially had to use his judgment.[263] If there were no other reliable way to estimate damages, then the court might resort to the royalty method, but not here.

---

[258] Bersin Tr. 830–32; JX 905 at 52.

[259] Bersin Tr. 833; JX 905 at 52.

[260] Bersin Tr. 834; JX 905 at 52.

[261] Bersin Tr. 836–37; JX 905 at 53.

[262] *See* JX 905 at 53, 79.

[263] *See* Bersin Tr. 835–36; JX 905 at 50.

## 2. Exemplary Damages Under DUTSA

DUTSA authorizes a court to award exemplary damages: "If wilful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a) of this section."[264] The Buyer is entitled to exemplary damages.

Delaware courts define "willful" misappropriation as "awareness, either actual or constructive, of one's conduct and a realization of its probable consequences," and "malicious" misappropriation as "ill-will, hatred, or intent to cause injury."[265] Mike, Phil, and Aaron knowingly stole the Company's trade secrets and used them to compete with the Company. They knew they were taking the Company's trade secrets because of how they had treated the information over the years. Not only that, but Mike had just sold the Company and all of its information to the Buyer for $450

---

[264] 6 *Del. C.* § 2003(a).

[265] *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *28 (Del. Ch. Jan. 29, 2010) (holding that defendant's misappropriation was willful and malicious because defendant "knew, or had reason to know, that . . . the sales volume figures . . . [and] customer lists . . . constituted [] trade secrets" and "used those trade secrets" to steal plaintiff's customers and employees); *see id.* ("[Defendant] chose to . . . lure away members of [plaintiff's] sales force and customer base. These actions alone demonstrate that [defendant] acted recklessly with intent to injure [plaintiff]."); *Nucar Consulting, Inc. v. Doyle*, 2005 WL 820706, at *14 (Del. Ch. Apr. 5, 2005) (holding that defendants' misappropriation was willful and malicious because defendant "deliberate[ly] [used plaintiff's trade secrets] to contact an identified potential client" of the plaintiff and solicit their business), *aff'd*, 913 A.2d 569 (Del. 2006) (TABLE).

million. In the Sale Agreement, Mike had represented that the Company possessed and owned trade secrets.

Mike's misappropriation was also malicious. He harbored ill-will toward the Buyer and sought to harm the Company. He engaged in a calculated campaign to lure away employees and customers using misappropriated trade secrets. While doing so, he and his nephews actively concealed their activities from the Buyer and encouraged others to do the same. During the litigation, Mike, Phil, and Aaron spoliated evidence, with Mike setting his phone to automatically delete text messages when he was bound by a preliminary injunction.[266]

Mike's emails reveal his malice. Mike called the Buyer and its employees "a circus," "the evil empire," a "scumbag company," "a-holes," "a bunch of clowns," "[b]ozos," "brain-dead," and "dumbasses."[267] He called David Hird "David Tird."[268] He harassed the Buyer's witnesses and employees throughout this litigation.[269] He gestured in a taunting email to the Buyer that he might violate this court's preliminary injunction.[270] He even encouraged the Company's customers—while still

---

[266] Mike Tr. 113; JX 702 at 26.

[267] Rinaldi Tr. 23; JX 116; JX 480; JX 594; JX 638; JX 664; JX 670.

[268] Aaron Tr. 415–16.

[269] After Hird's first deposition in this case, Mike sent him a text message stating: "Mr. Ethics sold his soul, and you know it. I think I will enjoy your hard copy testimony." Mike Tr. 114; JX 710.

[270] Mike Tr. 112; JX 728.

a Company employee—to buy from the Company's main competitors and threaten to move their business to extract pricing concessions.[271] The hostility was one-sided; there is no comparable evidence of the Buyer engaging in similar activity or harboring similar animus.[272]

Phil and Aaron did not engage in similar email activity, but acted jointly with Mike as part of the same conspiracy. All three are liable for exemplary damages.

Scant guidance exists on the amount of exemplary damages to award. The maximum is two times the compensatory damages. This case could warrant a maximum amount, but the court will be more conservative and impose the same amount awarded for compensatory damages. The award of an additional $0.9 million and $24,224,125.59 brings the total damages to approximately $50 million, still less than the alternative royalty-based calculation. That figure also represents approximately 11% of the price the Buyer paid. A total damages award in that range seems reasonable given the magnitude of the misappropriation, the damage to the Company, and the need to discourage comparable acts of misappropriation.

---

[271] *See* JX 116.

[272] To the contrary, the Buyer remained professional throughout. In a June 28, 2023 internal email, the Buyer's General Counsel provided her apt observation: "In my view, Mike has not been able to let go of the fact that he sold the company and this has brought to the surface an incredible amount of tension between Mike and what he views are inferior and questionable business decisions on the part of the acquiror of his company. Operating the company in a compliant and ethical manner comes at a cost." JX 541 at 1.

### 3. Expenses Under DUTSA

DUTSA allows an injured party to recover expenses (including attorneys' fees) if "wilful and malicious misappropriation exists."[273] Together with Phil and Aaron, Mike engaged in willful and malicious misappropriation. The Buyer is entitled to recover its expenses (including attorneys' fees). The Buyer may move to quantify the amount if the parties cannot agree.

## IV. BREACH OF CONTRACT

The Buyer proved that Mike breached his restrictive covenants. The Sale Agreement provides that "all disputes between the parties under or relating to this Agreement . . . will be governed by . . . the laws of the State of Delaware."[274] Delaware law therefore governs the contract claims.

"The elements of a claim for breach of contract are (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[275]

### A. Breach Of The Non-Competition Covenant

In the non-competition covenant, Mike committed not to

---

[273] 6 *Del. C.* § 2004.

[274] SPA § 12.13.

[275] *Trifecta Multimedia Hldgs. Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 470 (Del. Ch. 2024); *accord New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 137 (Del. Ch. 2023); *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

engage in any activity or act in any manner (other than as a less than five percent (5%) shareholder of a publicly traded corporation) for the purpose of establishing, operating, assisting or managing any Person that engages in a Restricted Business in [all geographical areas within the United States, Canada, and Europe].[276]

The Sale Agreement defined "Restricted Business" as "peracetic acid products, bromine-based biocides or sodium chlorites and any other business conducted by the Company or contemplated to be conducted by the Company as of the Closing Date."[277]

Capacity Chemical sells many of the same products the Company sold as of the Closing Date, often to the same customers. Capacity Chemical operates in the United States. Capacity Chemical is therefore a "Person that engages in a Restricted Business" under the non-competition covenant.

Mike violated the non-competition covenant by providing Phil and Aaron with access to $4 million in seed funding for Capacity Chemical.[278] His support constituted an act for the purpose of establishing a company engaging in the Restricted Business and assisting it in operating.

Mike violated the non-competition covenant by sending Phil and Aaron a master formula database of Company formulas.[279] That act was for the purpose of assisting a company engaging in the Restricted Business.

---

[276] SPA § 7.5(a).

[277] *Id.* art. I.

[278] *See* Phil Tr. 247–48; JX 424 at 3.

[279] Mike Tr. 77–85; JX 561; *see also* JX 575; JX 576; JX 577; JX 578.

Mike violated the non-competition covenant by giving Phil and Aaron a steady stream of business, technical, and regulatory advice on how to operate Capacity Chemical.[280] Mike's support was essential because Phil and Aaron are neither scientists nor chemists, have no knowledge about regulatory requirements, and had never started a chemical business. Giving Phil and Aaron advice constituted an act for the purpose of assisting a company engaging in the Restricted Business.

Mike violated the non-competition covenant by managing Capacity Chemical's laboratory operations and supervising Capacity Chemical employees.[281] Those activities breached the non-competition covenant because they assisted a company engaging in the Restricted Business.

Mike violated the non-competition covenant by working on the PAA registrations he covertly obtained so that Capacity Chemical eventually could use them to sell PAA products. That activity constituted an act for the purpose of assisting a company engaging in the Restricted Business.

Mike argues that the non-competition covenant is too broad because it includes the word "assisting." Delaware courts review restrictive covenants "to ensure . . . that they are (i) reasonable in geographic scope and temporal duration, (ii) advance

[280] *See, e.g.*, Phil Tr. 251, 255; Hird Tr. 485; JX 519; JX 525; JX 544; JX 550; JX 551; JX 559; JX 561; JX 567; JX 571; JX 589; JX 619; JX 644; JX 647; JX 662; JX 669.

[281] *See, e.g.*, Hird Tr. 485, 488–89, 496; *see* Mike Tr. 89–90; JX 550 at 1; JX 675 at 2.

legitimate economic interests of the party seeking enforcement, and (iii) survive a balancing of the equities."[282] "Delaware courts do not mechanically enforce restrictive covenants; instead they are 'closely scrutinized.'"[283] Broader restrictions are permissible in a business-sale context.[284]

Mike argues that including the word "assisting" renders the covenants overbroad as it would sanction trivial acts like buying coffee for a friend who is working for a competitor.[285] That is not persuasive.

Under the interpretive principle of *noscitur a sociis*, "a word in a contract is to be read in light of the words around it."[286] This principle prevents the non-competition covenant from extending to trivial or immaterial assistance. The verb "assisting" appears in a series comprising "establishing, operating, assisting or managing." The acts of establishing, operating, and managing involve material involvement with the person engaged in the Restricted Business.

---

[282] *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 485 (Del. 2024).

[283] *Id.* at 752–53 (quoting *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977)).

[284] *See Intertek Testing Servs. NA, Inc. v. Eastman*, 2023 WL 2544236, at *4 (Del. Ch. Mar. 16, 2023); *Arxada Hldgs. NA Inc.* v. *Harvey*, C.A. No. 2024-0771-JTL, at 22 (Del. Ch. Oct. 24, 2024) (TRANSCRIPT) ("Broader restrictions are permissible in the sale of a business.").

[285] Defs.' Opening Br. 29.

[286] *Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp.*, 2013 WL 1821608, at *10 (Del. Ch. May 1, 2013).

A restriction on giving material assistance to a competing business is reasonable under the circumstances. The Buyer paid $450 million to purchase a company that Mike built from the ground up and ran as a family business for three decades. The Buyer knew that through Mike, the Company had developed longstanding relationships with its customers. In conjunction with a sale of the business, the scope of the non-competition covenant reflected a reasonable restriction on Mike's ability to compete and undercut the value of the business he had sold.

## B.     Breach Of The Employee Non-Solicitation Covenant

In the employee non-solicitation covenant, Mike committed not to

> solicit to hire, employ, or retain any employee of the Company in any capacity whatsoever, or solicit, aid, or induce any such employee to leave such employment or to accept employment with or render services to or with any other Person, or take any action to materially assist or aide any other Person in identifying, hiring or soliciting any such employee, in each case without the express written consent of the Company or Buyer . . . .[287]

Mike repeatedly breached the employee non-solicitation covenant.

Mike breached the employee non-solicitation covenant by facilitating Phil and Aaron's departure. He notified them that he was being terminated, coordinated with them on departing to start a competing firm, and assisted them by providing access to $4 million in start-up funding. Through those actions, Mike aided and induced Phil and Aaron to leave the Company's employment.

---

[287] SPA § 7.5(b).

Mike breached the employee non-solicitation covenant again by identifying Hird to Phil and Aaron as the person who should head Capacity Chemical's laboratory operations.[288] Taking that action materially assisted Phil, Aaron, and Capacity Chemical in identifying, soliciting, and hiring a Company employee.

Mike breached the employee non-solicitation covenant by suggesting to Phil and Aaron that Capacity Chemical hire Tina Rodrigues and recommending she be paid "maybe $150–200k."[289] Mike also had several calls with Rodrigues.[290] Taking those actions constituted soliciting an employee to leave the Company and materially assisting Phil, Aaron, and Capacity Chemical in identifying, soliciting, and hiring a Company employee.

Mike breached the employee non-solicitation covenant by encouraging Capacity Chemical to hire Fabian Moralez.[291] Taking that action constituted materially assisting Phil, Aaron, and Capacity Chemical in identifying, soliciting, and hiring a Company employee.

## C. Breach Of The Customer And Supplier Non-Solicitation Covenant

In the customer and supplier non-solicitation covenant, Mike committed not to

---

[288] JX 953 (Mike's test message to Hird saying, "You were my top pick to run the tech dept. . . . You are in the right place at the right time. You can make an indelible impact on your future AND the company." (emphasis in original)).

[289] JX 640; Mike Tr. 68–69.

[290] *See* JX 640; *see also* JX 825 at 11, 22 (phone records).

[291] JX 545.

(i) solicit, directly or indirectly, for the benefit of any Person other than the Company, . . . any Person, firm or entity that was a customer (or Affiliate thereof) or actively sought customer ( or Affiliate thereof) of the Company during the twelve (12) month period ending on the Closing Date ("Customers") for the purpose of providing such Customers any products or services offered by the Company as of the Closing Date,

(ii) induce or attempt to induce any supplier (or Affiliate thereof) of the Company during the twelve (12) month period ending on the Closing Date ("Suppliers") to refrain from or cease doing business with the Company, or

(iii) otherwise intentionally interfere with, disrupt or attempt to disrupt the relationship, contractual or otherwise, between the Company and any Customers or Suppliers.[292]

Mike repeatedly breached the non-solicitation covenant by attempting to disrupt the Company's relationships with its customers and suppliers.

Mike breached the non-solicitation covenant by marketing Capacity Chemical's offerings to his former business associates and customers.[293] Through those actions, Mike sought to divert the suppliers and customers from the Company for Capacity Chemical's benefit.

Mike breached the non-solicitation covenant by developing registered PAA products for Capacity Chemical to sell and coordinating with Phil and Aaron to

---

[292] SPA § 7.5(c) (formatting added).

[293] *See, e.g.*, Mike Tr. 240–42; JX 431 ("I talked to David Iasic tonight. He is a [Company] customer and will switch all his business when you are ready. It's about $600–$800k. Also Madison will sign up . . . maybe $1m with no warehousing."); JX 433 at 1 ("I am not under any NDA or restrictions. I didn't sign one on my exit. However, my 2 boys quit [the Buyer] and are starting their own company in a few months and I know they'd be quite interested in being a distributor in CA if that works. They also are under no restrictions as well, so this could be a good fit.").

inform the market. Those actions sought to indirectly divert suppliers and customers away from the Company by educating them that Capacity Chemical's PAA products were coming.[294]

## D. Causally Related Injury

As a result of Mike's breaches of his restrictive covenants, the Company now faces a direct competitor that is using the Company's former employees, trade secrets, and information to sell to the Company's top customers.

## E. The Remedy

As a remedy for Mike's breaches of his restrictive covenants, the Buyer seeks permanent injunctive relief extending the time the covenants remain in force. The court awards that remedy.

To obtain a permanent injunction, including a permanent injunction involving an extension of a noncompete, a plaintiff must show (i) actual success on the merits, (ii) inadequacy of remedies at law, and (iii) a balancing of the equities that favors an injunction.[295] The Buyer has satisfied these elements.

The Buyer proved on the merits that Mike breached his restrictive covenants. Mike does not meaningfully dispute that the Buyer lacks an adequate remedy at law

---

[294] *See* JX 621 ("Here is our first Omri certified irrigation line treatment, its [sic] for the 5.6% PAA called OXY 5."); *see also* JX 622; JX 624; JX 625; JX 630; JX 648; JX 649; Aaron Tr. 423–25.

[295] *inTEAM Assocs., LLC v. Heartland Payment Sys., Inc.*, 2016 WL 5660282, at *26 (Del. Ch. Sep. 30, 2016), *aff'd in part, rev'd in part on other grounds*, 171 A.3d 544 (Del. 2017).

for future breaches of his restrictive covenants. The equities favor issuing the injunction. Mike agreed in the Sale Agreement not to compete with the Buyer or solicit its employees, customers, and suppliers for a period of five years. He immediately breached the covenants. The Buyer did not begin receiving the protection it had bargained for until October 24, 2024, when the court entered a preliminary injunction barring Mike from violating his restrictive covenants.[296]

A court can extend a restrictive covenant to replace the period during which a party was in breach.[297] That remedy is warranted here. The restrictive covenants would have lasted for five years, or until December 9, 2026. The Buyer was deprived of 1,050 days of protection. The court's injunction will impose restraints on Mike coterminous with the restrictive covenants, or until October 24, 2029.

---

[296] Dkt. 96.

[297] *See Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *28 (Del. Ch. July 22, 2015) (Delaware law; extending injunction to account for most of the period of breach); *accord Levitt Corp. v. Levitt*, 593 F.2d 463, 468–69 (2d Cir. 1979) (New York law; authorizing extension of noncompete as remedy for breach); *Corp. Exp. Off. Prods. v. Warren*, 2002 WL 1901902, at *17 (W.D. Tenn. May 24, 2002) (Tennessee law; finding that "the covenant not to compete is tolled effective the date on which Fisher began competing with Corporate Express"); *Rogers v. Runfola & Assocs., Inc.*, 565 N.E.2d 540, 543–44 (Ohio 1991) (Ohio law; holding that court can extend restrictive covenant period as remedy for breach); *Homan, Inc. v. A1 AG Servs., L.L.C.*, 885 N.E.2d 253, 259 (Ohio Ct. App. 3d Dist. 2008) (Ohio law; holding that covenant not to compete could be extended to reflect period required to litigate breach); *Roanoke Eng'g Sales Co. v. Rosenbaum*, 290 S.E.2d 882, 885–87 (Va. 1982) (Virginia law; holding that noncompete could be extended to address period of breach). *cf. Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2009 WL 3161643, at *15 (Del. Ch. Sep. 30, 2009) (enforcing tolling provision and extending restrictive covenant to address period of breach), *aff'd*, 7 A.3d 486 (Del. 2010).

## V.    TORTIOUS INTERFERENCE WITH CONTRACT

The Buyer asserted claims for tortious interference with contract against Phil, Aaron, Capacity Chemical, and BlueTech.

Delaware has adopted the formulation of a claim for tortious interference with contract that appears in the Restatement (Second) of Torts.[298] Generally, "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other."[299] Reframed as elements, a plaintiff must plead "(1) a contract, (2) about which defendant knew, *and* (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[300]

In this case, the contract was the Sale Agreement containing the restrictive covenants. Mike excerpted and sent Phil and Aaron copies of the relevant pages. Both understood that Mike was subject to restrictive covenants.[301] They claim not to have

---

[298] *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012); *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749, 751 (Del. 2010).

[299] Restatement (Second) of Torts § 766 (A.L.I. 1979), Westlaw (database updated Sep. 2025).

[300] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (internal quotation marks omitted).

[301] JX 403.

known the details because they did not study the pages carefully, but they knew enough.

This decision has found that Mike breached his restrictive covenants. Phil and Aaron knew about his breaches, and they engaged in intentional and ongoing actions that were a significant factor in causing the breaches, *viz.* the three of them knowingly conspired together to compete with the Company through Capacity Chemical and BlueTech.

Phil and Aaron lacked justification for working with Mike to breach his restrictive covenants. They showed their awareness of their unjustified interference by seeking to hide Mike's involvement.

Creating Capacity Chemical and competing with the Company injured the Company. BlueTech's development of its registrations (through Mike) also injured the Company by creating competitive products for Capacity Chemical to sell. Contract damages are limited to compensatory damages. The court has found that the Buyer suffered $0.9 million in lost profits. Phil, Aaron, Capacity Chemical, and BlueTech are jointly and severally liable for that amount.

## VI. BREACH OF FIDUCIARY DUTY

The Buyer proved that Mike, Phil, and Aaron breached their fiduciary duties. A claim for breach of fiduciary duty is an equitable tort.[302] The basic elements of a

---

[302] *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort."); *see* Restatement (Second) of Torts, *supra*, § 874 cmt. b ("A fiduciary who commits a breach

common-law tort are familiar: The plaintiff must prove the existence of a duty, a breach of that duty, an injury, and a causal connection between the breach and injury that is sufficient to warrant a remedy, such as compensatory damages.

The equitable tort for breach of fiduciary duty has only two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty.[303] The first element resembles the corresponding aspect of a common-law tort: The plaintiff must prove that the defendant owed a fiduciary duty to the plaintiff. The second element departs from the common-law model in significant respects. For a common-law tort, the court analyzes breach using the standard of conduct that the defendant was expected to follow.[304] For a breach of fiduciary duty, the court evaluates breach using a standard of review.[305] The standard of review is always more forgiving toward the defendant

---

of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act."). *See generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010).

[303] *See Beard Rsch.*, 8 A.3d at 601; *accord ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sep. 21, 2009) (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002)).

[304] *See generally* Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L. Rev. 437, 461–67 (1993).

[305] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35–36 (Del. Ch. 2013); *see also* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 451–52 (2002); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards*

fiduciary and more onerous for the plaintiff beneficiary than the standard of conduct.[306] Delaware decisions traditionally did not acknowledge the distinction between the standard of conduct and the standard of review,[307] but Delaware jurists now do so openly to explain the divergence between the normative framing of what fiduciary duties require and their practical application to the facts of a case.[308]

---

*of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295–99 (2001) [hereinafter *Function over Form*].

[306] *Chen*, 87 A.3d at 667 ("The numerous policy justifications for this divergence largely parallel the well-understood rationales for the business judgment rule."). For cogent explanations, see *Function over Form*, *supra*, at 1296, and *Realigning the Standard*, *supra*, at 454–58; *accord* Eisenberg, *supra*, at 461–67; E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1421–28 (2005); Julian Velasco, *The Role of Aspiration in Corporate Fiduciary Duties*, 54 Wm. & Mary L. Rev. 519, 553–58 (2012). Opinions articulating the policy rationales for applying standards of review that are more lenient than the underlying standards of conduct include *Brehm v. Eisner*, 746 A.2d 244, 255–56 (Del. 2000) and *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996) (Allen, C.).

[307] *See* David Kershaw, *The Foundations of Anglo-American Corporate Fiduciary Law* 185, 221–22 (2018). Despite the lack of open acknowledgment, the divergence could be seen in earlier cases, such as decisions distinguishing between the articulated duty of directors to exercise reasonable care and the liability standard of gross negligence. *See, e.g.*, *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *In re Walt Disney Deriv. Litig.*, 907 A.2d 693, 749–50 (Del. Ch 2005), *aff'd*, 906 A.2d 27 (Del. 2006). Professor Kershaw notes that New York cases maintained a similar distinction from the late nineteenth century until the codification of the fiduciary standard of care in 1961. *See* Kershaw, *supra*, at 185–86.

[308] *See, e.g.*, *Manti Hldgs., LLC v. Carlyle Gp. Inc.*, 2022 WL 1815759, at *7 (Del. Ch. June 3, 2022) (Glasscock, V.C.); *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *15 (Del. Ch. May 31, 2022) (McCormick, C.), *aff'd*, 302 A.3d 387 (Del. 2023); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 809 (Del. Ch. 2022) (Will, V.C.); *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *30 (Del. Ch. May 6,

Although a claim for breach of fiduciary duty has only two formal elements, a beneficiary cannot obtain a meaningful remedy without additional showings that parallel the other elements of a traditional common-law tort. One is harm to the beneficiary or a benefit wrongly received by the fiduciary.[309] Another is a sufficiently

---

2021) (Zurn, V.C.); *Cumming v. Edens*, 2018 WL 992877, at \*18 (Del. Ch. Feb. 20, 2018) (Slights, V.C.); *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at \*27 n.202 (Del. Ch. July 24, 2014) (Noble, V.C.); *Chen*, 87 A.3d at 666–67 (Laster, V.C.); *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1112 (2008) (Parsons, V.C.); *see also Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1275 n.102 (Del. 2018) (Strine, C.J.).

[309] *See Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011) ("[I]t is inequitable to permit the fiduciary to profit from using confidential corporate information. Even if the corporation did not suffer actual harm, equity requires disgorgement of that profit."); Doug Rendleman, *Measurement of Restitution: Coordinating Restitution with Compensatory Damages and Punitive Damages*, 68 Wash. & Lee L. Rev. 973, 990 (2011) ("Actual harm to the corporation is not, the [*Kolberg Kravis*] court held, a prerequisite for a plaintiff to state a claim for restitution-disgorgement.").

convincing causal linkage between the breach and the remedy sought.[310] A court may award nominal damages when a breach does not warrant a meaningful remedy.[311]

In responding to the Company's claims, Mike, Phil, and Aaron never sought to defend their conduct by proving that they satisfied a particular standard of review. The Buyer addressed the elements of duty and breach, framed in terms of the standard of conduct. Mike, Phil, and Aaron made arguments in response, but did not seek to prove that their conduct was fair to the Company. This decision evaluates the claim using the framework that the parties used. Accordingly, if Mike, Phil, and Aaron owed a fiduciary duty and breached it, a remedy follows.

---

[310] *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773, 775 (Del. 2006) (explaining that when seeking post-closing damages for breach of fiduciary duty based on false or misleading disclosures, plaintiff must prove a causal link between disclosure violation and quantifiable damages); *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *20 (Del. Ch. July 21, 2017) (finding transaction was fair where controller engaged in acts of unfair dealing, but third party bidder intervened and severed any causal connection between controller's actions and ultimate deal price), *aff'd*, 184 A.3d 1291 (Del. 2018) (TABLE); *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 314–15 (Del. Ch. 2013) ("A failure to disclose material information in this context [of a request for stockholder action] may warrant an injunction . . . but will not provide a basis for damages from defendant directors absent proof of (i) a culpable state of mind or non-exculpated gross negligence, (ii) reliance by the stockholders . . . , and (iii) damages proximately caused by that failure.").

[311] *See, e.g.*, *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *2, *19, *25 (Del. Ch. Mar. 21, 2018) (awarding nominal damages for breach of duty), *aff'd*, 210 A.3d 705 (Del. 2019) (TABLE); *Lake Treasure Hldgs., Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *1, *9, *13 (Del. Ch. Oct. 10, 2014) (same); *Oliver v. Bos. Univ.*, 2006 WL 1064169, at *25, *29–30, *32, *34–35 (Del. Ch. Apr. 14, 2006) (same); *Leo Invs. Hong Kong Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, 342 A.3d 1166, 1206–08 (Del. Ch. 2025) (same).

## A. Existence Of A Fiduciary Duty

Mike, Phil, and Aaron were Company employees. Employees are agents.[312]

Agents are fiduciaries.[313] Agents owe duties to their principals under a particularly

well-developed body of fiduciary law.[314]

---

[312] Restatement (Third) of Agency § 7.07(3)(a) (A.L.I. 2006), Westlaw (database updated Oct. 2024) ("[A]n employee is an agent whose principal controls or has the right to control the manner and means of the agent's performance of work . . . ."); *accord* Restatement (Second) of Agency § 429 (A.L.I. 1958), Westlaw (database updated Oct. 2024) ("The rules as to the duties and liabilities to the principal of agents who are not servants apply to servants."); Restatement (First) of Agency § 2 (A.L.I. 1933), Westlaw (database updated Oct. 2024) ("A master is a species of principal, and a servant is a species of agent. The words 'master' and 'servant' are herein used to indicate the relationship from which arises the tort liability of an employer to third persons for the tort of an employee."). *See* Restatement (Second) of Agency, *supra*, Index M100 ("A master is a principal; a servant is an agent with special powers and rights additional to those of agents not servants. Hence all the rules applicable to principal and agent apply to master and servant . . . .").

The Restatement (Third) of Employment Law takes the position that not all employees are agents, stating: "Employees in a position of trust and confidence with their employer owe a fiduciary duty of loyalty to the employer in matters related to their employment. Other employees who come into possession of the employer's trade secrets owe a limited fiduciary duty of loyalty with regard to those trade secrets." Restatement of Employment Law § 8.01(a) (A.L.I. 2015), Westlaw (database updated Oct. 2024). Even under this more limited rule, "[e]mployees breach their duty of loyalty to the employer by: (1) disclosing or using the employer's trade secrets for any purpose adverse to the employer's interest, including after termination of the employment relationship; (2) competing with the employer while employed by the employer; or (3) misappropriating the employer's property, whether tangible or intangible, or otherwise engaging in self-dealing through the use of the employee's position with the employer." *Id.* (citations omitted). The analysis of Mike's fiduciary status, obligations, and breach would be the same if the Restatement (Third) of Employment Law applied.

[313] Restatement (Third) of Agency, *supra*, § 1.01 ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the

principal's control, and the agent manifests assent or otherwise consents so to act."); *see Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980) ("It is true, of course, that under elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing."); Ramon Casadesus-Masanell & Daniel F. Spulber, *Trust and Incentives in Agency*, 15 S. Cal. Interdisc. L.J. 45, 68 (2005) ("While all agents are fiduciaries, not all fiduciaries are agents."); Thomas Earl Geu, *A Selective Overview of Agency, Good Faith and Delaware Entity Law*, 10 Del. L. Rev. 17, 20 (2008) (explaining that fiduciary status is "a result of agency" and collecting authorities establishing the point); Barak Orbach, *D&O Liability for Antitrust Violations*, 59 Santa Clara L. Rev. 527, 528 n.2 (2020) ("All agents are fiduciaries but not all fiduciaries are agents.").

There are Delaware cases that errantly assert that an agency relationship, standing alone, does not give rise to fiduciary duties on the part of the agent. *See Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *20 (Del. Ch. Mar. 5, 2014) ("Under Delaware law, the relationship of agent to principal does not itself give rise to fiduciary duties." (citing *Prestancia Mgmt. Gp., Inc. v. Va. Heritage Found., II LLC*, 2005 WL 1364616, at *6 (Del. Ch. May 27, 2005)). That assertion can be traced to *Metro Ambulance, Inc. v. Eastern Medical Billing, Inc.*, where it originated. *See* 1995 WL 409015, at *3 (Del. Ch. July 5, 1995) ("The existence of a principal/agent relationship does not, in and of itself, give rise to a fiduciary relationship."). As the sole support for that assertion, the *Metro Ambulance* decision cited *Maull v. Stokes*, 68 A.2d 200 (Del. Ch. 1949), but the *Maull* decision did not say that not all agents are fiduciaries. The *Maull* case involved a contractor who was hired to build a house and a garage. The contractor performed additional work not covered by the contract, and when he was not paid, he filed a mechanic's lien. The homeowner sued in the Court of Chancery for an accounting, and the question was whether equitable jurisdiction existed. The court held that there is "an implied relation of principal and agent between the owner of the property and a general contractor for the construction of a building thereon." *Id.* at 202. In the sentence that the *Metro Ambulance* court seems to have relied on, the *Maull* court stated that "[e]quity will not compel an agent to account to his principal merely because of the existence of that relation." *Id.* That sentence addresses the availability of an accounting. It does not suggest that some agents are not fiduciaries to their principals. To the contrary, the court exercised jurisdiction over the suit because (1) there was a fiduciary relationship and (2) the numerous details of the transactions meant that the matter could not be determined accurately or fairly by a jury in a court of law. *Id.* at 202–03. The assertion that some agents are not fiduciaries is not accurate and would cause Delaware law to conflict with settled doctrine.

[314] *See generally* Restatement (Third) of Agency, *supra*, §§ 8.02–.12.

An agent owes a fiduciary duty of loyalty to the principal as to all matters within the agency relationship.[315] The duty of loyalty includes "a duty (1) not to use property of the principal for the agent's own purposes or those of a third party; and (2) not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party."[316] "Termination of an agency relationship does not end an agent's duties regarding property of the principal."[317] "A former agent who continues to possess property of a principal has a duty to return it and to comply with the management and record-keeping rules" applicable to agents. [318] The principal's property includes its confidential information. "An agent's duties concerning confidential information do not end when the agency relationship terminates. [319] "An agent is not free to use or disclose a principal's trade secrets or other confidential information whether the agent retains a physical record of them or retains them in the agent's memory."[320]

---

[315] *Id.* § 8.01 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship.").

[316] *Id.* § 8.05.

[317] *Id.* § 8.05 cmt. b.

[318] *Id.*

[319] *Id.* § 8.05 cmt. c.

[320] *Id.*

An agent's duty of loyalty includes a duty of obedience. That duty demands that the agent "take action only within the scope of the agent's actual authority."[321] It also requires compliance with directives from the principal or from more senior agents to whom the agent reports.[322] When the principal or a senior agent has made a decision, the duty of obedience may require compliance with that decision, even if the agent might independently have followed a different course.[323] An agent also has a duty to use reasonable care, competence, and diligence, with the applicable standard taking into account any special skills or knowledge possessed by the agent.[324] More generally, the agent has a duty of good conduct. Under that duty,

---

[321] *Id.* § 8.09.

[322] *Id.*

[323] *Firefighters' Pension Sys. of City of Kansas City v. Found. Bldg. Materials, Inc.*, 318 A.3d 1105, 1138 (Del. Ch. 2024) (noting that officers are agents and explaining that "[w]hen the board has made a decision, the duty of obedience may require compliance with that decision, even if the officer might independently have followed a different course").

[324] *See* Restatement (Third) of Agency, *supra*, § 8.08 ("Subject to any agreement with the principal, an agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents in similar circumstances. Special skills or knowledge possessed by an agent are circumstances to be taken into account in determining whether the agent acted with due care and diligence. If an agent claims to possess special skills or knowledge, the agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents with such skills or knowledge.").

"within the scope of the agency relationship," the agent must "act reasonably" and "refrain from conduct that is likely to damage the principal's enterprise."[325]

An agent's duties also include a duty to provide information to the principal.[326] "In general, an agent has the burden of explaining to the principal all transactions that the agent has undertaken on the principal's behalf."[327] "The agent bears this burden because evidence of dealings and of assets received is more likely to be accessible by the agent than the principal."[328]

The duty of loyalty prohibits the agent from competing with the principal. "Throughout the duration of an agency relationship, an agent has a duty to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors."[329] The agent can, however, "take action, not otherwise wrongful, to prepare for competition following termination of the agency relationship."[330]

An agent has other duties as well. These are the black-letter duties that most plainly apply to this case.

---

[325] *Id.* § 8.10.

[326] *Id.* § 8.11.

[327] *Id.* § 8.01 cmt. b.

[328] *Id.*

[329] *Id.* § 8.04.

[330] *Id.*

## B. Breaches Of Duty

Mike, Phil, and Aaron breached their fiduciary duties in multiple ways. During his employment, Mike advised customers on how to negotiate against the Company, thereby acting against his principal's interests. Mike worked with BlueTech to terminate its distribution agreement with the Company, thereby acting against his principal's interests and depriving the principal of property in the form of its right of first refusal for BlueTech's EPA registrations.

Mike, Phil, and Aaron breached their duty to not misuse the Company's assets, including its confidential information, by misappropriating over 25,000 documents, including over 1,000 formulas. Mike, Phil, and Aaron further breached their duty to not misuse the Company's assets, including its confidential information, by using the information to start and operate Capacity Chemical, with Phil and Aaron running the new company and Mike running its lab.

Mike, Phil, and Aaron breached their duty to provide information to their principal by acting in secret and concealing their activities. Mike did so blatantly. For example, when advising a customer on how to negotiate against the Company, he told the customer, "DELETE THIS EMAIL AND DENY YOU EVER SAW IT."[331] Just before leaving the Company, Phil told Company management that he planned to start

---

[331] JX 116 (emphasis in original).

a company that would provide logistics services, and he claimed Mike would not be involved.[332]

## C.    Standing

The defendants argue that the Buyer lacks standing to assert claims for breach of fiduciary duty. As fiduciaries of the Company, Mike, Phil, and Aaron owed fiduciary duties to the Company and its stockholders. The Buyer is the sole stockholder of the Company and can assert a claim for breach of fiduciary duty. That claim is derivative, but the Buyer controls the Company, and the Company does not oppose the Buyer's assertion of the claim.

## D.    The Remedy

As a remedy for Mike, Phil, and Aaron's breaches of fiduciary duty, the Buyer requests the same remedies it has received under DUTSA and for breach of the restrictive covenants. For the breach of fiduciary duty, the court awards compensatory damages and expenses (including attorneys' fees).

When awarding damages for a fiduciary breach, the court seeks to achieve two goals: (1) addressing the harm suffered by the beneficiary and (2) forcing the fiduciary to disgorge the benefits generated by its misconduct. "Once disloyalty has been established, [Delaware remedial] standards . . . require that a fiduciary not profit

---

[332] *See* JX 639 at 3.

personally from his conduct, and that the beneficiary not be harmed by such

conduct."[333]

> The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.[334]

"A breach of fiduciary action is not an action for breach of contract where the plaintiff

can only recover its own loss; instead, the fiduciary can be forced to disgorge its gain

even when the gain did not come at the beneficiary's expense."[335] "Even if the

corporation did not suffer actual harm, equity requires disgorgement."[336]

---

[333] *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996) (citations omitted).

[334] *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

[335] *Ban v. Manheim*, 339 A.3d 41, 77 (Del. Ch. 2025).

[336] *Kolberg Kravis*, 23 A.3d at 838 (holding "[e]ven if the corporation did not suffer actual harm, equity requires disgorgement" when a fiduciary improperly uses a corporate asset—there, confidential information); *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ("It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary. The result is nonetheless one of unjust enrichment which will not be countenanced by a Court of Equity."); *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 860 (Del. Ch. 2022) ("a beneficiary can force a fiduciary to disgorge the benefits that the fiduciary received without a showing of harm to the beneficiary"); *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *24 (Del. Ch. July 6, 2018) ("Although a claim for breach of fiduciary duty has only two formal elements, a plaintiff will not be awarded a meaningful remedy without additional showings that parallel the other elements of a traditional common law tort claim. One is a showing of harm to the beneficiary or, alternatively, the wrongful taking of a benefit by the fiduciary."), *aff'd sub nom.*, *Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE);

Like the DUTSA compensatory damages remedy, the fiduciary damages remedy thus would include both damages for past harm and a measure of disgorgement. The court awards the same compensatory damages remedy for the fiduciary breach.

DUTSA, however, authorizes exemplary damages. [337] Absent statutory authorization, the Court of Chancery lacks the power to award exemplary or punitive damages.[338] The fiduciary remedy does not include exemplary damages.

Injunctive relief is the hardest. If ruling solely on the breach of fiduciary duty issues, the court might impose some forward-looking injunctive relief, but it would not go as far as the remedy for breach of the restrictive covenants. The equitable challenge is to prevent Mike, Phil, and Aaron either from using the information they took from the Company or from enabling anyone else to use it. Injunctive relief addresses those issues.

For Mike, there is no need to craft a separate, independent injunction, because it would be encompassed by the injunction enforcing the restrictive covenants. If a ruling on appeal removes the basis for the injunction enforcing the restrictive

---

Rendleman, *supra*, at 990 ("Actual harm to the corporation is not, the [*Kolberg Kravis*] court held, a prerequisite for a plaintiff to state a claim for restitution-disgorgement.").

[337] 6 *Del. C.* § 2003(b).

[338] *Beals v. Wash. Int'l, Inc.*, 386 A.2d 1156, 1159 (Del. Ch. 1978); *see* 1 Wolfe & Pittenger, *supra*, § 2.05.

covenants while preserving the finding of fiduciary breach, then the court could take on that challenge if the senior tribunal remanded the case.

Phil and Aaron are not subject to an injunction enforcing restrictive covenants. They are enjoined for a period of one year from using any of the materials that they or Mike took from the Company.

The fiduciary remedy includes a right to recover expenses (including attorneys' fees).[339] This court can award attorneys' fees and expenses as a component of a damages award for the breach of the duty of loyalty.[340] Mike breached his fiduciary duty as an employee by taking the Company's trade secrets and using them to compete with the Buyer and aiding and inducing Phil and Aaron to do the same. A court will not always award expenses (including attorneys' fees) as a remedy for fiduciary breach, but Mike's pre-litigation conduct was egregious. It included

---

[339] The Buyer also seeks expenses (including attorneys' fees) under the bad faith exception to the American Rule. Having awarded expenses under DUTSA and on fiduciary grounds, this decision does not reach the bad faith argument. When awarding expenses (including attorneys' fees) as damages for a breach of fiduciary duty, a court also takes into account the seriousness of the misconduct. That can cause the fiduciary analysis to resemble one version of bad faith fee-shifting, which can be imposed for egregious pre-litigation conduct (irrespective of fiduciary status). This decision applies the fiduciary damages framework, not the bad-faith litigation exception.

[340] *William Penn P'ship v. Saliba*, 13 A.3d 749, 759 (Del. 2011); *Metro Storage*, 275 A.3d at 867–68.

colluding to hide his involvement with BlueTech, [341] lying to the Buyer, [342] and encouraging others to keep their misconduct "on the down low."[343]

## E.    DUTSA Preemption

There is a strong argument that DUTSA preempts at least part of the fiduciary duty cause of action. DUTSA "displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret."[344] It "does not affect" contractual remedies, "[o]ther civil remedies that are not based upon misappropriation of a trade secret," or criminal remedies. [345] The defendants, however, did not make this argument.

---

[341] JX 614.

[342] JX 448 at 1, 2; JX 597 at 10; JX 610 at 2.

[343] Mike Tr. 240; *see also* JX 498 ("I'm working on the PAA part of [Capacity Chemical] but that needs to be on the down low."); *see* JX 601 at 2 ("Keep in mind no one knows what I'm doing except my boys, and now you."); JX 443 ("There is no way [the Buyer] or anyone else for that matter can figure this out."); JX 611 ("It is important not to tell Todd anything we are doing at BlueTech. He . . . would . . . throw me under the [Buyer] bus for violating my non-compete.").

[344] 6 *Del. C.* § 2007(a).

[345] *Id.* § 2007(b); *see Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*, 2023 WL 4560984, at *2 (Del. Ch. July 14, 2023) ("Smash's fraud claim fails because the Delaware Uniform Trade Secrets Act ('DUTSA') preempts it. DUTSA preempts all common law claims based on conduct that otherwise would give rise to a claim under DUTSA if the misappropriated information qualified as a trade secret. Smash contends that Perri's fraud enabled him to misappropriate its information."), *aff'd sub nom.*, *McLaren v. Smash Franchise P'rs, LLC*, 319 A.3d 909 (Del. 2024).

There are also differences between the DUTSA analysis and the fiduciary duty analysis. Mike breached his fiduciary duties by acting on behalf of the Company's customers and against the Company's interests, an issue that does not implicate DUTSA. Mike, Phil, and Aaron breached their fiduciary duties by failing to disclose their conduct to their employer, an issue that also does not implicate DUTSA. The principal remedial difference is that the Buyer did not request injunctive relief against Phil and Aaron under DUTSA. The Buyer requested injunctive relief against Phil and Aaron as a remedy for their common law breaches.

Because the defendants did not make the DUTSA pre-emption argument, the court has analyzed the causes of action and remedies separately. Except for the injunctive relief against Phil and Aaron, all the relief this decision awards for breach of fiduciary duty falls within the relief already awarded under DUTSA. The Buyer can only receive a single recovery.

## VII.  AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

The Buyer asserted claims for aiding and abetting breaches of fiduciary duty against Capacity Chemical and BlueTech. The Buyer proved those claims.

To prevail on a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must prove (1) the existence of a fiduciary relationship, (2) a breach of fiduciary duty, (3) knowing participation in that breach by the defendant, and (4)

96

damages proximately caused by the breach.[346] The Buyer proved that Mike, Phil, and Aaron breached their fiduciary duties during their employment.

"Termination of an agency relationship does not end an agent's duties regarding property of the principal."[347] "A former agent who continues to possess property of a principal has a duty to return it."[348] When an agent has breached its duties to its principal by taking its principal's assets, including confidential information, the breach continues after the termination of the fiduciary relationship if the former agent continues to retain or misuse the asset. That is what Mike, Phil, and Aaron did here. Their knowledge of their actions is imputed to Capacity Chemical and BlueTech, rendering Capacity Chemical and BlueTech liable for aiding and abetting their continuing breaches of fiduciary duty.

As a remedy, Capacity Chemical and BlueTech are jointly and severally liable for the fiduciary damages remedy. They are also enjoined to the same extent as Phil and Aaron. The same points regarding DUTSA pre-emption apply.

## VIII. THE MITIGATION DEFENSE

The defendants claim the Buyer cannot recover damages because it failed to mitigate. The duty to mitigate prevents a party from recovering damages "for loss

---

[346] *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 389 (Del. 2024).

[347] Restatement (Third) Of Agency, *supra*, § 8.05 cmt. b.

[348] *Id.*

that he could have avoided by reasonable efforts."[349] The defendants contend the Buyer should have asked them to stop using their trade secrets and return their information. That would have accomplished nothing. Even after trial, the defendants contend they did nothing wrong. Failure to mitigate is not a defense.

## IX.    INTEREST

The Buyer asks for prejudgment interest. "In Delaware, prejudgment interest is awarded as a matter of right."[350] Pre-judgment interest is "computed from the date payment is due, in other words, from the date on which the damages begin to accrue."[351] Here, damages had begun to accrue by at least September 16, 2022—by which time the Harveys had misappropriated the Company's trade secrets. Pre-judgment interest will run from that date, compounded quarterly, at the legal rate, with the legal rate changing at the start of the next quarter after a change in the reference rate. The Buyer is entitled to post-judgment interest at the same rate and compounding interval until the judgment is satisfied.

## X.    CONCLUSION

The court will enter a final judgment awarding the Buyer the relief set forth in this decision. Before that can be accomplished, the court must quantify the expense

---

[349] *ITG Brands, LLC v. Reynolds Am., Inc.*, 2023 WL 6383240, at *22 (Del. Ch. Oct. 2, 2023), *aff'd*, 2025 WL 3646459 (Del. Dec. 15, 2025) (TABLE).

[350] *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992).

[351] *New Start Hldgs., LLC v. Zhou*, 2024 WL 4039440, at *28 (Del. Ch. Sep. 4, 2024) (internal quotation marks omitted).

award. The parties must meet and confer over an amount. If they agree, then the parties must submit a proposed final order, agreed as to form, that implements the rulings made and relief awarded in this decision. If there are issues to address before a final order can be entered, then the parties must submit a joint letter identifying those issues and proposing a path forward. If the parties cannot agree on an amount of expenses, then the joint letter must include a schedule for resolving that issue. The instruction to identify issues that need to be addressed to end this proceeding means existing issues the parties have raised and that the court may have overlooked. It is not an invitation to raise new issues or seek a do-over.